No. 27,944.

THE WICHITA GAS COMPANY, *Appellee*, v. THE PUBLIC SERVICE COMMISSION et al., *Appellants*.

No. 27,945.

THE HUTCHINSON GAS COMPANY, *Appellee*, v. THE PUBLIC SERVICE COMMISSION et al., *Appellants*.

No. 27,946.

THE NEWTON GAS COMPANY, *Appellee*, v. THE PUBLIC SERVICE COMMISSION et al., *Appellants*.

(268 Pac. 111.)

*William A. Smith*, attorney-general, *M. J. Healy, John M. Kinkel* and *Louis E. Clevenger*, all of Topeka, for the appellants.

*Fred S. Jackson*, of Topeka, and *Robert D. Garver*, of Kansas City, Mo., for the appellees.

The opinion of the court was delivered by

BURCH, J.: These actions were commenced by the gas companies of Wichita, Hutchinson and Newton to enjoin enforcement of sched-

ules of rates for the sale of gas in those cities, and to enjoin the public service commission from preventing the gas company from putting into effect a rate scheme known as the three-part rate. The issues were referred to a referee, and the cases were heard together. The referee made findings of fact and conclusions of law; the report of the referee was approved by the district court, and the relief prayed for by the gas companies was granted. The public service commission appeals.

The commission promulgated an order fixing rates to become effective September 1, 1926. These rates were to supersede existing schedules of rates which were put into effect in August, 1920. The commission and the gas companies agreed the 1920 schedules were unsound. The referee found they were confiscatory, and they were enjoined. After the gas companies prevailed in the district court, the commission took no step to stay the judgments, and the gas companies were at liberty to put into effect schedules of reasonable rates. Instead of adopting the three-part rate, they put into effect another schedule. While that schedule was designated as temporary, it will stand until lawfully superseded, and the three-part rate is no longer in controversy.

The Wichita case will be considered first. The first question to be determined was, What amount of property did the gas company devote to public service, on which it was entitled to earn a fair return? The company purchased the plant in July, 1925, of the Kansas Gas and Electric Company, for $2,690,000, and made subsequent additions and betterments, so that the total cost was $2,892,-594. The commission's rate base was $2,450,000. In the district court it accepted the rate base proposed by its engineer, Fletcher, which was $2,533,642. The company's engineer, Strickler, put in evidence a table which he prepared showing the reproduction cost new of the physical property, and reproduction cost depreciated. The commission does not choose to print the table in its abstract. Fletcher's tables are printed in full. Fletcher found the reproduction cost new to be $3,030,316. He then found the historical cost to be $2,426,931, added historical cost to reproduction cost, and divided by 2. The quotient was $2,728,623, which he said was fair value new. This value was depreciated to find the rate base. The books of the company did not provide data for computation of historical cost, and there was no other evidence of historical value. Historical

value is a fact, and historical value ascertained as Fletcher ascertained it, by guesswork suavely called "estimate," is a misnomer. In his dissenting opinion in the case of *McCardle v. Indianapolis Co.*, 272 U. S. 400, Mr. Justice Brandeis said:

"The process of determining facts will inevitably be misleading unless each step bears a close relation to the realities of life." (p. 424.)

The two engineers differed with respect to method of determining depreciation. What was the value of the 355 miles of distribution mains, which Fletcher estimated would cost $1,562,848 to reproduce? Strickler dug hundreds of holes in the ground, and looked at the pipe. Fletcher looked in his books, and determined the matter "scientifically," without the trouble of physical inspection. He used tables, which he said are to the engineer what mortality tables are to a life insurance company. The cost of reproducing the entire plant, item by item, was estimated. The life years of each item, ranging from 50 years to 5 years, was estimated. The average was 41 + years. The dollars invested yearly were estimated in part according to the historical method which has been adverted to, and the average age of the dollars in fixed capital accounts was found to be 9 +. Therefore, the present condition of the Wichita gas utility had to be $\frac{41-9}{41} = 78 +$ per cent, and the reproduction cost of the gas mains was depreciated by that formula, without regard to their actual condition. The court understands the primary requirement of the scientific method is to get the facts by observation, when they are ascertainable by observation. Life tables are useful. They show averages based on wide experience. But when a life insurance company insures a person 21 years old, whose life expectancy is 41.53 years, it does not rely on the tables. It requires him to undergo a physical examination, to determine if he has cancer, or tuberculosis, or something which will reduce his expectancy below the average. Fletcher said, however, that inspection of pipe in the ground will disclose just two things: first, that it was laid so recently as to be new; second, that you can kick a hole in it. Strickler said soil conditions have much to do with the deterioration of pipe, and the inspection method is more dependable than application of life tables. The supreme court of the United States approves Strickler's method. In the Indianapolis case, *supra*, involving a water plant, the city engineer used Fletcher's method, and deducted approximately 25 per cent of estimated cost new, to cover depreciation. The court said:

"The deduction was not based on an inspection of the property. It was the result of a 'straight line' calculation based on age and the estimated or assumed useful life of perishable elements. . . . Mr. Hagenah made an estimate of existing depreciation based on actual inspection and a consideration of the probable future life as indicated by the conditions found. He deducted less than six per cent. . . . The testimony of competent valuation engineers who examined the property and made estimates in respect of its condition is to be preferred to mere calculations based on averages and assumed probabilities. The deduction made in the city's estimate cannot be approved." (p. 416.)

In the commission's brief it is said:

"The referee, in his report, did not recognize the method used by the commission's engineer in arriving at a 'fair value' of the property, did not consider the figures submitted by the commission's engineer on the question of estimated book investment, nor the estimated condition of the fixed capital accounts."

The only basis for this statement is that the referee did not see fit to adopt Fletcher's method and figures, and the statement illustrates the public service commission's method of presenting its case. In his report the referee said:

"The engineer for the plaintiffs based his testimony as to depreciation upon a careful examination of the properties. Several hundred openings in the ground were made to enable him to examine the condition of the pipes. The engineer for the commission based his estimates of depreciation upon such historical data as was obtainable as to age of the properties, and then applied tabulations calculated upon the average life of similar property. . . . Taking all the evidence into consideration, it is therefore my judgment that the depreciation is in fact greater than that conceded by the plaintiffs' engineer, and less than that calculated by the engineer for the commission."

There is no contention in the commission's brief that material findings are not sustained by any substantial evidence. There is simply a persistent intolerance of evidence which conflicts with evidence produced by the commission, and this court is asked to accept as conclusive evidence produced by the commission which the referee did not consider was conclusive. The presumption of validity which in the beginning attended the commission's order no longer obtains. The presumption here is the judgment of the district court is correct. This court was not empowered by the constitution to try the case *de novo*, and findings of fact sustained by evidence are as conclusive upon this court as like findings returned in other cases.

Adding to the value of the physical property going-concern value and working capital, Fletcher proposed a rate base of $2,533,642. The referee reported as follows:

"The value of the property is a question of fact rather than of law, and it is to be determined by the court after giving due weight and consideration to all the evidence in the case. In arriving at the valuation of these several properties as hereinafter set out in the findings, I have attempted to give due weight and consideration to all of the evidence throwing light upon those elements of value that have been mentioned by the supreme court of the United States as proper for consideration in such cases as this."

As a result of this method of dealing with the evidence, the referee found the proper rate base to be $2,740,937.04, a sum smaller than Strickler's rate base and larger than Fletcher's rate base. The district court approved the referee's finding, and the finding is conclusive here. However, the commission admits the difference between the referee's rate base and Fletcher's rate base is not great enough to be material.

Expenditures made in operating the plant for the year ending July 31, 1926, were found by the referee to be:

Operating and maintenance ................................... $236,078.92
General overhead ..:.......................................... 238,162.76

$474,241.68

The items were shown in detail by the books of the company, and were not disputed. The summary does not include gas purchased, and includes an item of $27,018.05 paid to Henry L. Doherty & Company of New York, for financial advisory and supervisory services rendered. The referee found the services were valuable, and stated findings to include and exclude the item. The material portion of the referee's finding No. 7 reads as follows:

"The existing rates at Wichita have been in effect since August 17, 1920. . . . The existing rates in Wichita, Hutchinson and Newton consist of a customer's charge of seventy-five cents per month, and a flat charge for gas metered and used at Wichita of fifty-eight cents per thousand cubic feet, and at Hutchinson and Newton of sixty cents per thousand cubic feet. The evidence showed that upon a valuation of the Wichita property, as herein found, operations of the plaintiff company for the year ending July 31, 1926, were as follows:

Gas purchased, maintenance and operation, including taxes...... $1,548,567.49
Gross earnings from operation................................. 1,513,034.21

Net deficit .............................................. $35,533.28
Necessary for depreciation, 3 per cent of $2,415,262.93........... 72,547.00
Necessary for fair return, 8 per cent on $2,740,937.04............. 219,274.00

Total net loss............................................. $327,264.28"

Operating expenses are reasonable, normal expenses necessary to efficient and economical conduct of the business; and to show that rates were unjust the gas company was required to prove the expenditures for operating expenses were of the character described. The gas company produced the necessary evidence. There was other evidence, and the commission challenged particularly an item of $66,000 designated as "new business expense." The evidence was, the company was faced with an alarming decrease in consumption of gas. The witnesses for the company and for the commission agreed financial success of the company depended on increasing consumption of gas. The new business expense was incurred in putting into effect a plan for increasing gas consumption which was devised by Doherty years ago, and which has since been adopted by many public utilities. Fletcher thought the expenditure should be spread over a period of ten years. The commission now suggests a shorter period. The referee found the situation fairly indicated the expense would be a normal expense each year for several years. The commission is not the company's business manager. The company has a business manager of its own, who must be allowed good-faith exercise of judgment, discretion, and initiative. Fletcher testified as follows:

"Q. Do you have in mind, Mr. Fletcher, any item of expenses which you say is unreasonable in the actual experience of the company during the past year? A. I haven't analyzed it enough to state whether any item was an unreasonable expenditure.

"Q. You wouldn't question that the company has used its best judgment in the creation of these expenses, would you? A. I would not question that, no.

"Q. You may doubt its wisdom in some matters, but you think it has acted honestly in creating these expenses? A. I think so. I don't think a corporation spends money when they don't have to."

The referee's allowance of three per cent for depreciation is challenged. The allowance was sustained by competent testimony. In the order fixing rates the commission allowed 2.817 per cent, the amount which the company had already entered on its books for retirement expense (depreciation). Fletcher computed 2.4395 per cent as the proper allowance for annual retirement reserve. He made no inspection of the property, and consequently used a theoretical yardstick, as applied to the Wichita company's gas plant. Strickler used the factual method. The referee was not obliged to

accept Fletcher's testimony to the effect that inspection of the property could reveal nothing of consequence in determining its condition and how long it will probably last. The referee was authorized to give Strickler's testimony such weight as he deemed it deserved. The argument made here that the depreciation allowance is too high in comparison with the present condition of the property found by the referee, was doubtless made to the referee. If not, it should have been. This court has no knowledge of its own concerning what allowance should be made for annual depreciation of a natural gas distributing system. The question is one of fact, to be determined by the trier of the fact. It is not the province of this court on appeal to weigh the evidence, or the arguments based on conflicting evidence. Something like this has been said before in some Kansas case, and it applies with peculiar force to a case of this kind, which involves numerous vague means lying somewhere between extremes, which must be employed with the verisimilitude of exactness.

The observations just made apply to the allowance of 8 per cent as necessary for a fair return. The gas company dedicates its investment to the public service of furnishing, by means of proper instrumentalities, a desirable form of fuel. The company does not produce the commodity it sells. It must depend on interstate commerce for its supply. That supply depends on discovery, extension, development, and control of natural gas fields, and the hazards of natural gas production and transportation. The commission concedes the investment may become valueless for failure of supply. What should be the rate of return on that form of investment?

The law sets up certain standards for the general guidance of a fact-finding tribunal. The proposed question is one of fact, to be determined according to those standards by consideration of evidence duly produced at the trial of the issue. The evidence will include estimates and opinion evidence, and will involve an element of prophecy; but the finding of the court in a rate-review case, based on the evidence, of fair compensation for public utility service, is a finding of fact. To the extent a rate does not fairly compensate the utility for its service it is unjust, unreasonable, and unlawful, within the meaning of the public utilities act. A rate may also be confiscatory, and hence unlawful, on constitutional grounds. But a rate may be enjoined as unjust and unreasonable which is not so low as to be confiscatory of property. (*Railroad Co. v. Utilities*

*Commission*, 95 Kan. 604, 148 Pac. 667.)  The finding of the referee was that 8 per cent was not merely a fair return, but was necessary for a fair return.

There was no dispute about the rate in the district court.  The testimony for the gas company warranted the inference that 8 per cent was a fair rate, was usually allowed, and was necessary for a fair return.  Fletcher gave figures showing 8 per cent was a fair return; in all the pertinent tables introduced in evidence by the commission in the three cases 8 per cent was allowed, and there was no evidence showing or tending to show that 8 per cent was not necessary to a fair, just, reasonable and lawful return.  The commission now says this fair return must be determined in the light of present rates for money, and in its brief tells about commercial paper rates, time loan rates, yield of representative bond issues, and the selling price of public utilities bonds.  The referee was not given the benefit of this information at the trial.  In the case of *McCardle v. Indianapolis Co.*, 272 U. S. 400, the court said:

"It is obvious that rates of yield on investments in bonds plus brokerage are substantially less than the rate of return required to constitute just compensation for the use of properties in the public service." (p. 419.)

As indicated, at the trial nobody manifested any notion that less than 8 per cent would be a just and reasonable rate.  The finding that 8 per cent was necessary for a fair return merely responded to the undisputed evidence, and the subject may not be relitigated here.

Without debating the subject further, the district court's judgment that the existing rate was confiscatory is approved.

To show that the commission's rate was just, fair, and reasonable, the commission applied that rate to the company's business in the following remarkable document known as defendant's exhibit 88:

REVENUE.

| | |
|---|---:|
| Domestic gas sold—2,864,737 M cu. ft., at $0.5176081............ | $1,482,811.00 |
| Industrial gas sold—2,386,156 M cu. ft., at $0.1997297............ | 476,586.00 |
| Total gas-sale revenue....................................... | $1,959,397.00 |
| Income from penalties........................................ | 15,308.00 |
| Other operating income....................................... | 2,014.00 |
| Gross revenue ............................................. | $1,976,719.00 |
| Less bad debts and allowances................................ | 9,943.00 |
| Gross earnings from operation................................ | $1,966,776.00 |

EXPENSES.

| | |
|---|---|
| Domestic gas purchased—2,864,737 M cu. ft., at $0.20 | $572,947.00 |
| Unaccounted for domestic gas purchased—38,224 M cu. ft., at $0.20 | 7,645.00 |
| Industrial gas purchased—2,386,156 M cu. ft., at $0.14 | 334,062.00 |
| Unaccounted for industrial gas purchased—31,835 M cu. ft, at $0.14 | 4,457.00 |
| Operation and maintenance expense | 389,129.00 |
| Retirement expense | 66,551.00 |
| Total expense | $1,374,791.00 |
| Net return | $591,985.00 |
| 8 per cent of $2,527,763 | 202,221.00 |
| Surplus | $389,764.00 |

This exhibit is an impeachment of the integrity of the commission's order fixing the rates. It makes the rates yield to the company the enormous surplus, after paying all expenses and a dividend of 8 per cent, of $389,764, a net return on the investment of more than 23 per cent. Of course the commission did not wittingly impose that burden on the consumers of gas in Wichita, and doubt of the integrity of the exhibit arises. There was evidence which the referee regarded as reliable that the retirement expense item was too small, the operating and maintenance item was too small, and the increase in revenue from sale of domestic gas could not be attained. The exhibit gives the price of domestic gas purchased as 20 cents per thousand cubic feet. There was no evidence that gas could be purchased for less than 40 cents. The tables prepared by the gas company showing its application of the commission's rate, are not printed in the abstract. The abstract does state that, under the company's evidence, application of the commission's rates would result in a net annual loss of $492,697.

The Wichita Gas Company buys its gas of the Empire Natural Gas Company, which owns the pipe line bringing the gas from the state of Oklahoma to Kansas. The Wichita company pays the Empire company 40 cents per thousand cubic feet at the city gate. At one time this court was of the opinion the price was subject to regulation by the public service commission. (*State, ex rel., v. Gas Co.,* 111 Kan. 809, 208 Pac. 622.) This view was corrected by the supreme court of the United States. (*Kansas Natural Gas Co. v. The State, ex rel., sub nom. Missouri v. Kansas Gas Co.,* 265 U. S. 298.)

The pipe-line company and the distributing company have an

ultimate connection with what are spoken of as the Doherty interests. The shares of the gas company are owned by a nominee of the Gas Service Company. The shares of the Gas Service Company are owned by the Cities Service Company. The Cities Service Company is a holding company, owning the shares of public utility corporations of various kinds throughout the United States. They are all under the supervision of Henry L. Doherty & Company, 60 Wall street, New York City.

Henry L. Doherty & Company maintain a corps of experts in engineering, research work, and other activities, who render valuable services to gas companies by way of engineering advice, legal advice, accounting and auditing service, and assistance in matters of finance. One and three-fourths per cent of the gross revenue of the gas company is paid to Henry L. Doherty & Company for this service. There was no testimony that the compensation was either improper or extravagant, and it was admitted that it was paid in good faith. As indicated above, the referee did not specifically state that he approved or disapproved this item of expense of the gas company, but he used it in his calculation of fair return, and then showed omission of the item would not affect the result.

Doherty companies in Kansas and nearby states are managed from a regional general office. Other groups of Doherty companies are similarly managed. The offices of the general manager, the chief engineer, and the legal department, for this region, are maintained at Kansas City, Mo. The general ledgers of the Kansas gas companies are kept there. All general office expense, executive salaries, general clerical salaries, legal expense, and general traveling expense, are borne by the Kansas City office, and the proper sum is charged to each gas company. The referee found on abundant evidence that the sums paid by the three Kansas companies were reasonable and proper, and allowed them.

The precise relation of the pipe-line company to what, for lack of knowledge of the facts, may be called the Doherty organization, was not disclosed at the trial. It may be assumed that it is a subsidiary corporation, in the same sense that the gas companies are subsidiaries. In the recent case of *State, ex rel., v. Hutchinson Gas Co.*, 125 Kan. 337, 264 Pac. 44, the court considered the relation of the Hutchinson Gas Company to the Cities Service Company. In the opinion it was said:

"The statement by the [district] court that the Hutchinson Gas Company

was created for the use and benefit of the Cities Service Company, and that there were never any *bona fide* incorporators of the Hutchinson Gas Company, made as a reason for the appointment of a receiver, was without foundation in law. Subsidiary corporations are organized every day for the purpose of enabling parent corporations to carry on their business properly. Such corporations are not prohibited by law and are necessary under modern industrial conditions." (p. 338.)

In the case of *Berkey v. Third Avenue Railway Co.*, 244 N. Y. 84, Judge Cardozo, now chief judge, speaking for the New York court of appeals, said:

"The whole problem of the relation between parent and subsidiary corporations is one that is still enveloped in the mists of metaphor. Metaphors in law are to be narrowly watched, for starting as devices to liberate thought, they end often by enslaving it. We say at times that the corporate entity will be ignored when the parent corporation operates a business through a subsidiary which is characterized as 'alias' or a 'dummy.' All this is well enough if the picturesqueness of the epithets does not lead us to forget that the essential term to be defined is the act of operation. Dominion may be so complete, interference so obtrusive, that by the general rules of agency the parent will be a principal and the subsidiary an agent. Where control is less than this, we are remitted to the tests of honesty and justice. (Ballantine, Parent and Subsidiary Corporations, 14 Calif. Law Review, 12, 18, 19, 20.) The logical consistency of a juridical conception will indeed be sacrificed at times when the sacrifice is essential to the end that some accepted public policy may be defended or upheld. . . . At such times unity is ascribed to parts which, at least for many purposes, retain an independent life, for the reason that only thus can be overcome a perversion of the privilege to do business in a corporate form. We find in the case at hand neither agency on the one hand, nor on the other abuse to be corrected by the implication of a merger. . . . In such circumstances, we thwart the public policy of the state instead of defending or upholding it, when we ignore the separation between subsidiary and parent, and treat the two as one." (pp. 94, 95.)

It is impossible to declare, on the meager record in this case, either agency or abuse of corporate privilege, in the relation between the Kansas gas companies and the parent organization. The result is, the sale of gas by the pipe-line company to the gas company must be regarded as an instance of ordinary bargain between seller and buyer. All of the evidence, and there was much evidence on the subject, was that no gas was available to the gas companies at a price less than 40 cents per thousand cubic feet.

The commission offered in evidence an ordinance of the city of Wellington showing the rate the distributing company at Wellington charged, not the price it paid. It was admitted the Wellington com-

pany and the Wichita company were served by the same pipe-line company. The referee was advised the offer was made to prove the Wichita company could sell gas at a cheaper rate. The commission also offered in evidence the franchise granted by the city of Sterling to the Rice County Gas Company. The Rice county company was supplied by the Larutan Pipe Line Company with gas from Oklahoma, and Sterling was farther from source of supply than Wichita. The referee was advised the offer was made to show gas could be piped farther and sold for less. In the brief these offers, which were rejected, take on the following redoubtable aspect:

"Evidence was offered to prove that the reasonable cost of gas at the city gates at Wichita was not as high as that charged by the pipe-line company to the local distributing company. There was offered in evidence testimony showing that gas in sufficient quantities could be secured in the state of Oklahoma and transported to Wichita, Hutchinson and Newton at a cost much below 40 cents."

The commission asserted the gas company was not trying to get gas as cheaply as possible. The abstract shows the following pertaining to the subject:

"T. J. Strickler, for the plaintiff, testified as follows:

"That he was vice president and consulting engineer of the Wichita Gas Company. [His qualifications as engineer were admitted.] He served in such position since the formation of the company. That the Wichita Gas Company was employed only in distributing gas. That it had no gas offered to it except its present supply, which came from the Empire Natural Gas Company, and that no other rate except the rate of the Empire Natural Gas Company of 40 cents a M at the city gates, was ever offered to it. [It was then admitted in evidence that T. W. Sears, vice president and general manager of the Larutan Pipe Line Company, was asked if he knew any company in the field about Wichita that offered, or at that time was willing to supply gas to Wichita for domestic purposes at a price less than they were now paying, and his reply was 'No. sir.']"

This court has no information respecting the provisions of the Sterling franchise. In view of what the vice president and general manager of the Larutan company said, it does not seem important. But aside from that, the offers of evidence which were refused were not accompanied by any offer to prove the conditions or circumstances governing the acquisition and distribution of gas at Wellington and Sterling, and the offers had no tendency to prove that the Wichita company could buy an adequate and dependable supply of gas from anybody for a price less than that paid to the Empire company.

C. L. Bullock, vice president and general manager of the Wichison Industrial Gas Company, was produced as a witness for the commission. The commission offered to show by him that in July, 1924, he was in a position to supply the Kansas Gas and Electric Company with gas for domestic and industrial purposes, and a contract to do so at a price of 30 cents per thousand cubic feet was signed. A period of sixty days was allowed, before the contract was to take effect, for investigation of Bullock's ability to fulfill such a contract, and on the day before expiration of the sixty-day period, he received a telegram that the contract was canceled. The next day the papers said the Kansas Gas and Electric Company's properties in Kansas had been purchased by the Doherty interests.

The following was what Bullock was called to prove, as stated to the referee by the commission's attorney:

"The purpose of this whole thing is to show that this offer was made, was able to be fulfilled, and that it was necessary for these Doherty people to secure these properties in order to hold up the price of gas in Wichita, Hutchinson, and Newton. I make that offer."

The offer was rejected. What the referee desired to know was whether the Wichita Gas Company was neglecting opportunity to buy cheaper gas; and it would have borne more directly on the issues in the case if the attorney for the commission had asked Bullock if he or any person or corporation known to him was in a position to furnish the Wichita company with an adequate supply of domestic gas for less than 40 cents, at any time from July, 1925, to the time he was called to testify.

On the face of this record the Wichita Gas Company had no alternative to purchase of gas from the pipe-line company at 40 cents per thousand cubic feet. The public service commission could not improve the situation by requiring the gas company to purchase gas at 20 cents which it could not obtain, or to sell 40-cent gas at an unremunerative rate. Under the evidence the commission's rate was clearly confiscatory.

The judgments in the Hutchinson and Newton cases are challenged in precisely the same manner and on precisely the same grounds as the judgment in the Wichita case, and nothing would be gained by reviewing the evidence in those cases. The argument is that if a lower rate base were found, if a smaller sum for expenditures were approved, if 2 per cent were allowed for depreciation instead of 3

per cent, if less than 8 per cent were allowed for return, etc., etc., all as the commission contended should be done, the rates would yield a sufficient return.  The trouble is, the gas companies supported their contention that the rates were noncompensatory by evidence, and this court cannot retry the cases.  Its function is precisely what it was in the Wichita case, and enough has been said on that subject.

General criticisms of the judgments, as, for example, that findings made respecting the existing rate and the commission's rate were influenced by the referee's views respecting the three-part rate, have been considered.  They are all without substantial merit.  No useful purpose would be subserved by extending this opinion further.

The judgment of the district court in each case, enjoining enforcement of the existing rate and the commission's rate, is affirmed.

HARVEY, J., concurs in the result in the Wichita and Newton cases, and dissents in the result in the Hutchinson case.

HOPKINS, J., dissenting.