# WICHITA GAS CO. v. PUBLIC SERVICE COMMISSION OF STATE OF KANSAS et al.

## No. 1171–N.

District Court, D. Kansas, First Division.
May 28, 1930.

See, also, 2 F. Supp. 792.

Robert D. Garver, of Kansas City, Mo., for plaintiff.

Walter F. Jones, of Hutchinson, Kan., and Charles W. Steiger and C. J. Putt, both of Topeka, Kan., for defendant Public Service Commission.

A. V. Roberts and Vincent Hiebsch, both of Wichita, Kan., for defendant City of Wichita.

McDERMOTT, Circuit Judge.

The plaintiff attacks an order made by the Public Service Commission of Kansas, fixing rates for natural gas in Wichita. The plaintiff claims the order denies to it a fair return on its property. The defendants think otherwise.

█ This issue involves a valuation of the plaintiff's property used and useful in the public service; an examination into the expenditures reasonably incurred in the past to render the service, upon which a forecast of expenditures for the future may be predicated; an examination into past income for data from which to make a reasonably accurate prophecy of income under the rate order attacked; and an ascertainment of what, under the facts, is a reasonable allowance for depreciation and return. All reasonable presumptions are properly indulged in support of the order attacked; the clear burden is on the plaintiff to show that its results will confiscate plaintiff's property or the use thereof.

An exploration of these many questions of fact immediately leads to a labyrinth of tables and figures; a judicial examination thereof is a task which a trial court is ordinarily unable to discharge without assistance, unless it is willing to neglect the business of other litigants for a period of many months. Consequently, the court appointed John Hamilton, Esq., as a special master to hear the evidence and make findings of fact and conclusions of law; at the request of the court, the master has prepared an opinion setting out in detail the processes through which he arrived at his conclusions. The matter now comes on upon exceptions filed by the defendants to his findings. These exceptions have been briefed and argued.

█ The opinion of the master defines the issues, and states the history of the litigation so fully and so accurately, and his legal conclusions are so amply supported by authority, that an extended opinion by this court is unnecessary. His findings of fact demonstrate, by internal evidence, that he approached all questions of fact mindful of the presumption that the order of the commission is correct. For example, his finding of the underlying question of value is 20% less than acquisition cost; 30% less than the value fixed by the lowest of plaintiff's three experts; 15% less than the value found by the state court and approved by the Supreme

Court of Kansas, 126 Kan. 220, 268 P. 111, taking plant additions made in the two years since the state court valuation, at cost; and 10% lower than the valuation made by the Public Service Commission in 1926, plus plant additions at cost. In many, if not most, other fact questions, his findings were in favor of the defendants; for example, he discarded a large number of "demand" meters bought for service in Wichita, but not now in use; he allowed cost of cutting and restoring pavement over mains in accordance with defendants' theory; he disallowed any cost of financing as an element of value; disallowed any value for a stock of appliances kept for sale to consumers of gas; disallowed even reasonable contributions to charitable and civic enterprises as a matter of expense, and so on. It is sufficient to say that all of his findings, save a mechanical error in computation, are amply supported by the evidence; they are adopted as the findings of the court, and the exceptions thereto are denied, save only exception No. 11, which is sustained, so far only as it excepts to the duplication of the item of $17,480 as an expense of operation. During the test year the plaintiff incurred an expenditure of $87,400 for explosion losses, a hazard of the business which must be taken into account. The amount is unusually large, and the plaintiff therefore charged only one-fifth of it to the test year, which seemed to the master, and seems to me, to be eminently fair to the defendants. Defendants have discovered that, buried in a massive table of figures, this item was entered into a total theretofore used by the master. To add it again is a manifest but excusable error.

Before taking up specific exceptions, one peculiarity of this case should be mentioned. The rate order here involved was made in 1928. In 1926, the defendant commission made another order as to plaintiff's charges in Wichita. The plaintiff brought an action similar to this in the state court. In that case, extensive hearings were had before T. M. Lillard, Esq., a special master appointed by the state court. His report was adopted by the Hon. James A. McClure, then judge of the state district court. An appeal was taken to the Supreme Court of Kansas, and in June, 1928, that court affirmed the lower court. 126 Kan. 220, 268 P. 111. That litigation decided most of the questions now raised adversely to the defendants. The method of arriving at the depreciated value of the plant—its per cent condition; the so-called Kansas City expense; the 1¾% paid to Doherty and Company; relations of the pipe-line company with the plaintiff distributing company; the proper allowance for depreciation and return; all these were controverted by the same parties as to the same properties, and decided by the Supreme Court of Kansas. Within two months of that decision, the order now under attack was made. While there was some change in the value of the property and other conditions in the period between the two orders, yet it must be conceded that the plaintiff must prevail unless this court holds differently from the Supreme Court of Kansas upon the principles decided by that court.

That decision is not res judicata, because the orders in issue are not the same. The plaintiff has invoked the federal constitution, so the decision is not one of local law and binding as such. But an opinion handed down by the Supreme Court of Kansas is a persuasive authority in any court of the land; and should be given particular weight where it decides principles between the same parties in a controversy substantially identical. Furthermore, the principles decided are supported by authority and I am in accord therewith. Public confidence in the courts and the public policy of discouraging litigation require harmonious rulings in state and national courts exercising jurisdiction over the same people in the same territory, as far as possible; and the practice of litigating the same question in different courts is not to be encouraged.

### The City Gate Rate.

The nub of this case, as well as the entire controversy over gas rates in Kansas, is the 40 cent city gate rate. If that is a fair city-gate rate, the rates charged the consumer cannot be far out of line; if that rate is too much, then the consumers are paying too much. One of the so-called "Doherty" companies owns the supply line which brings the gas into Kansas from Texas and Oklahoma, and at the town border, or city gate, sells it in bulk to another Doherty Company. The Supreme Court of the United States has held that the supply lines are not subject to state regulation, because they are engaged in interstate commerce. Congress has not authorized the Interstate Commerce Commission to regulate them. Consequently such supply companies engaged in interstate commerce, may charge what they please for gas.

It does not follow that the plaintiff company, which is subject to state regulation, can claim as an operating expense any sum which it chooses to pay its allied company for

gas. An electric light company could not charge $4 a ton for steam coal in its operating expense, if coal was available at $3. Operating expenses must be reasonable and necessary. The law does not forbid one company to deal with an allied company, but it does subject such dealings to rigid scrutiny; a principle accepted and acted upon by the master.

 The people of Wichita are entitled to the convenience and economies of natural gas; the plaintiff company has to buy it. It is in fact paying 40 cents per M cubic feet for it. The supply company has a right, until Congress acts, to charge that price or any other. Is the proof such that plaintiff is entitled to charge that item as a part of its operating expense? The proof shows that the supply company earns about 8%, out of which sum it must get both depreciation and return, which is reasonable. Neither the state, nor this court, in this case, has any power to regulate such earnings; a detailed exploration of the value of the properties of the supply company in several states, its expense, its revenues from all sources, was not attempted, and since no power over its earnings exists, probably would serve no useful purpose. The defendants therefore attack the rate from other angles.

The defendants' principal argument is that the supply company sells to industrial consumers and other purchasers, in and near Wichita, for 20 cents. The argument is faulty because it overlooks the load factor. The whole difficulty with domestic gas is that domestic users consume more gas in winter than in summer. The average domestic consumption in Wichita is 4,800 M per day. Yet on certain days, the domestic consumption runs to 40,000 M per day. The domestic user needs his gas more on the cold days than the warm ones. The result is that enough gas must be produced or contracted for, and big enough lines built, to furnish 40,000 M per day. On 364 days, there is a surplus of gas and equipment. The plant is eight times too large for the average load; but it must be, or the people be short of gas when they need it most. Now the problem is, What is to be done with the surplus gas and surplus equipment? Is it better for all to make some use for it, or let it lie idle? If it lies idle 360 days in the year, the loss is terrific; if surplus equipment and surplus gas is used in competition with coal, at a competitive price, whatever comes in from that source would look like clear gain. It appears to me that the net result of selling the surplus gas at 20 cents is to reduce the cost of gas to the domestic consumer. Some return is accruing from the otherwise idle equipment. I can see no fair comparison between selling surplus gas to an industry with an ordinarily constant load factor, reserving the right to shut off its gas at any moment, and the service of standing by ready to serve a domestic user with whatever he wants, from 30 feet a day in summer to 1,000 feet a day in winter. The situation is not unlike an ocean liner; it is built to carry 1,000 passengers; to carry them, it is necessary to build a ship that will carry ten times the weight of the passengers; the surplus capacity may be used for either ballast or freight. The passengers should not complain if freight is carried, although the rate per pound is much less than the rate per pound charged the passenger.

 It seems to me that the best test of the validity of the 40 cent rate is whether gas can be procured for less. The record shows that a competing supply line comes into Wichita. It is looking for a purchaser for its gas. If the 40 cent rate is too high, the natural thing is to turn to its competitor. For nearly four years counsel for the defendants have realized the importance of the 40 cent rate in these rate matters. Counsel for the city advises the court that for two years they have endeavored to get an offer from the competing company at a lower rate. After the hearings before the master were completed in this case, the defendants directed my attention to the testimony of some officer of the competing supply company, in another case, in which he testified the competing company could sell for less. I continued further proceedings in this case, and gave defendants all the time they asked to bring in some written offer from the competing supply company to the plaintiff. But put to the test, the competing company would make no offer of any kind. When, after four years assiduous effort, no one can be found that will offer to supply the needs of the plaintiff for less than 40 cents, it cannot be said that plaintiff is at fault in not paying less than that for its gas.

The 40 cent rate was established many years ago; since then, conditions have changed materially; apparently inexhaustible fields of gas have been discovered in Texas, but many millions have been expended in development and construction. The 40 cent rate was one of the principal controversies in the state court litigation; the situation as it existed when the matter was litigated in the state court was substantially the same as when the rate order in question was made;

the Supreme Court of Kansas affirmed the finding of the trial court that the 40 cent rate should be charged as an operating expense.

The plaintiff in fact pays 40 cents for its gas; it is conclusively shown that no lesser rate is open to it; there is no suggestion, in the record, of collusion or fraud; the evidence shows the rate to be reasonable. Under similar circumstances, the rate has been approved by the state courts; and I find no reason for sustaining the exceptions leveled at that rate.

## Valuation.

The usual controversy between "prudent investment" and "present value" is not presented by the exceptions. The record does not disclose the original cost of the entire plant; the acquisition cost to plaintiff is $600,000 more than the present value found by the master, values generally having decreased since the acquisition. In other words, the same situation is now presented as existed when Smyth v. Ames, 169 U. S. 466, 18 S. Ct. 418, 42 L. Ed. 819, was decided; present value is less than cost, and it is the public which is benefited by the "present value" theory, and the utility benefited by the "prudent investment" idea.

■■■■ Present value is a fact, and the properties as a whole must be considered. The eminent fairness of the master's findings on value are indicated by the following table:

| | | |
|---|---|---|
| 1. Commission's rate base in 1926 (126 Kan. 221, 268 P. 111)...... | | $2,450,000 |
| Plus additions at cost (undepreciated) ...................... | 290,776 | $2,740,776 |
| 2. Rate base of Commission's Engineer in state case.......... | | $2,533,642 |
| Plus additions at cost (undepreciated) ...................... | 290,776 | $2,824,418 |
| 3. State court's approved finding of value ...................... | | $2,740,937 |
| Plus additions at cost (undepreciated) ...................... | 290,776 | $3,031,713 |
| 4. Acquisition cost .......................... | | $3,196,869 |
| 5. Lowest of plaintiff's experts on valuation ...................................... | | $3,338,594 |
| 6. Commission's finding of value in present case ................................... | | $2,304,878 |
| 7. Master's finding in present case........ | | $2,502,620 |

The slightest calculation shows that, even if the commission's finding of value be accepted, it would make no difference in the result of the case. The particular error assigned is the allowance for $250,000 for going value, instead of $150,000, testified to by defendants' expert. Going value is not goodwill, or franchise, value. It represents the difference between the value of the physical structure—the bare bones—and the value of the same structure as a going business. It is

difficult to measure, but it exists; the allowance is only 10%, well within the range approved by many courts and commissions. The particular complaint is that a part of this value came by reason of new business, the expense of which was charged to operating. Assuming, without deciding, that such is the fact, it is immaterial. Many expenses of ordinary maintenance are properly charged to operating, and yet when the plant is valued, there is no deduction made because certain elements of value, such as a repaired main or a painted building, came about originally from operating expense. But even if the master's finding be rejected, the duty then devolves upon this court to make a finding; and from the evidence, I find $250,000 a fair allowance for going value.

An examination of the record on the value of plaintiff's properties as a whole, shows that the master's finding is not only fair, but favorable, to defendants, and all exceptions as to value are denied.

## Operating Expense.

■■■ Four objections are made to operating expense. Three of them have been rejected by the Supreme Court of Kansas.

To increase domestic consumption—which manifestly increases the amount of high-priced gas sold and tends to lower rates or keep them from getting higher—the company spends about $25,000 a year. The propriety of spending money for advertising the wares of a utility is for the owners to determine. Railroads, telephone and telegraph companies find it advisable. The method used by plaintiff to increase its business is appropriate, the amount expended reasonable, and the results have justified the expenditure. This increased consumption benefits the supply company, and the supply company bears no part of the cost, just as an increased consumption of electricity benefits those who supply natural gas or fuel oil for the boilers. The question is, Does the plaintiff company have a right, with or without aid from the supply company, to advertise its wares? I agree with the Supreme Court of Kansas, that it has.

Certain of the company's necessary work is done from Kansas City by the Gas Service Company, which does the same work for a number of other distributing companies. The method should make for economy; the expenditures are conceded. It is claimed that all of these expenses should be disregarded because some charitable contributions enter into them. The evidence discloses that such contributions are negligible, and the amount

prorated to Wichita so small that their elimination would have no bearing on the result.

Doherty and Company are paid 1¾% of the gross receipts for certain services rendered and detailed by the master. The law is settled by the decisions of the Supreme Courts of the United States and of Kansas concerning the 4½% contract between the American Telephone and Telegraph Company and its subsidiaries. The record and the master's findings bring this case within that law. It is contended that the work done by Doherty and Company duplicates the work done at Kansas City. The record is to the contrary. It is contended that the services by Doherty and Company are paid for as they are rendered, and that the 1¾% payment is profit. The record is to the contrary. In fact, the undisputed evidence shows that the 1¾% was arrived at by ascertaining the actual cost of the services rendered to all distributing companies, and apportioning it according to gross sales. Furthermore, the record shows, without dispute, that the necessary operating expenses are less than they would be if the Wichita plant were operated as an independent unit.

 The fourth objection involves the matter of leakage. After the gas passes the city gate, a small percentage leaks from the mains before it passes the customers' meters. The plaintiff pays the supply company therefor, but gets no pay from its customers. The plaintiff charged all of this leakage to domestic consumption, at 40 cents. The defendants claimed a part should be charged to industrial business, with which the master and this court agree. The part which should be so charged is difficult of ascertainment. The length of mains is a factor, for obviously the amount of leakage in a mile of pipe used to furnish 1,000 M cubic feet to one industrial consumer, would be much less than in twenty miles of pipe used to furnish the same amount of gas to a thousand domestic consumers. On the whole, the master's conclusion that one-eleventh should be charged to the industrial business seems reasonable, and is not seriously complained of. The serious complaint is that the plaintiff charges this domestic leakage at the 40 cent rate; the defendants argue that the leakage is constant; that the load factor is comparatively even throughout the year; that the plaintiff's justification for charging 40 cents for domestic gas, and only 20 cents for industrial, is because of the load factor; that the same argument, applied to leakage, would result in a 20 cent charge for leaking gas. There would

be much force in the argument if this litigation involved the charges of the supply company. However, the supply company does charge 40 cents for all leaking gas, and the question comes back to the proposition of the 40 cent rate for all domestic gas; and the reasons set out in sustaining that charge are applicable.

The exceptions as to operating expenses are denied.

### Depreciation.

 The master has found that 3% is a reasonable depreciation or replacement reserve. This presents a pure question of fact, since the reasonableness of this charge depends upon the longevity of the various items making up the property, and kindred questions of obsolescence, etc. Three per cent. appears to be reasonable, and lower than has been allowed for similar property. Fort Worth Gas Co. v. City of Fort Worth (D. C.) 35 F.(2d) 743. The evidence supports the finding. Upon this same property, the Supreme Court of Kansas approved an allowance of 3%. Defendants contend that it should be set aside because plaintiff only credits the account, on its books, with 1.87%. Bookkeeping entries have little or no bearing on the life of a 10-inch pipe. If bookkeeping governed, doubtless plaintiff would charge 10% to depreciation reserve. The exception is denied.

### Rate of Return.

In his calculation, the master used 8% as a fair return. This figure was approved by the Supreme Court of Kansas for this property.

 The return allowed a utility should be somewhat higher than that procurable from bonds, mortgages, or other fixed obligations. No one is obligated to pay the utility the return allowable. It can keep it if it can earn it. Its fortunes are subject, to some extent, to business conditions, dependent upon the supply of gas holding out, affected by the price of other fuel, and many other considerations. Twenty years ago the securities of electric interurban carriers were at a premium. The automobile has pretty nearly wiped that value out. To permit an interurban to earn 10% is of little value now, because ordinarily it cannot earn it. Competition injects a hazard into the natural gas business which is not present in mortgages or bonds. For example, electricity has supplanted, almost entirely, gas for lighting; it is making serious inroads on gas for cooking; in the field of heating, gas meets the competition of coal and fuel oil. This hazard must be taken into account. What is a fair return

depends upon many factors. Recently the Supreme Court of the United States has held that a return of 6.26% to a street railway company was confiscatory, and indicated that 7½% to 8% was necessary. United Railways v. West, 280 U. S. 234, 50 S. Ct. 123, 74 L. Ed. 390. The business of an established street railway company in a city as large as Baltimore is at least as stable as the supplying of natural gas. Probably a "reasonable return" is not a mathematical point. At any rate, no question is here presented of whether 6% or 7% is a fair return. For even with a 6% return, the rate under attack is still confiscatory. The exception as to the rate of return is denied.

### Discrimination.

It is claimed that plaintiff's income for the test year is too low because it charged some domestic consumers at the industrial rate. I do not find satisfactory evidence of this in the record. But even so, it is stated, without denial, that the plaintiff must supply these customers at the lower rate, or not supply them at all, because the commission authorized a competitor to sell them at lower rates. If so, the revenue received is better than no revenue at all. If there is an unlawful discrimination, it is not within the issues of this case. The amount involved is so negligible that it can be disregarded.

### Revenue under Commission Rate.

There was no dispute before the master as to the revenue which the commission rate would produce, as applied to the test year. There are some 20,000 domestic consumers in Wichita. The plaintiff made a study of the monthly accounts of 4,000; the defendants concede that is a fair number, and that the accounts selected produce a reliable average. The accounts studied were the same as used in the state case, and were for a year prior to the test year here involved. The earlier year was used to avoid duplicating the expensive task of studying another 48,000 monthly accounts. All of these facts were known by defendants long before the hearings closed before the master, and impliedly acquiesced in; no other figures were introduced. This study, Exhibit 9, disclosed that the commission's rates would produce a return of $1,696,000 a year.

After those hearings were closed, defendants discovered that by the application of the commission rates to another exhibit (Exhibit 2), a larger revenue, to wit, $1,840,398, would be produced. The case was reopened, and evidence taken as to which of the exhibits disclosed the truth. That evidence leaves no doubt as to the substantial accuracy of plaintiff's Exhibit 9. Exhibit 2 was prepared for another purpose, and assumed that a customer used the same amount of gas each month, which of course is not true. Applying a step-rate to such an assumption results in a distortion of fact.

Exhibit 9 is not exact; exactness cannot be procured without an examination of 240,000 accounts. But an average taken from a large number of representative accounts gives a substantial accuracy which is enough; it is the system on which life insurance companies operate. The exception as to estimated revenue is denied.

### Conclusion.

Some minor points are raised. On the whole, however, it seems clear that the rate order, applied to the test year, would return to plaintiff a gross income of about $1,696,000 per year. Of this sum, the plaintiff must pay out for gas purchased, approximately $1,122,-000. Its necessary and reasonable operating costs are about $461,000—a total outlay of $1,583,000. This would leave, for depreciation and return, $113,000. That is, an allowance on a plant worth $2,500,000, of 4.52% for both depreciation and return. That is not enough.

The operating expenses found by the master should be reduced in the sum of $17,480. Otherwise, the findings are approved, and the exceptions denied.

A decree may be drawn permanently enjoining the order complained of, and taxing the costs to the defendants.