## PACIFIC GAS & ELECTRIC CO. v. RAILROAD COMMISSION OF CALIFORNIA et al.

### No. 3660.

District Court, N. D. California, S. D.

Feb. 5, 1934.

Chaffee E. Hall, Charles P. Cutten, Warren Olney, Jr., Allan P. Matthew, and McCutchen, Olney, Mannon & Greene, all of San Francisco, Cal., for plaintiff.

Arthur T. George, Ira H. Rowell, and Roderick B. Cassidy, all of San Francisco, Cal., for defendants.

Before WILBUR, Circuit Judge, and ST. SURE and LOUDERBACK, District Judges.

PER CURIAM:

Plaintiff sues in equity, seeking to restrain the enforcement of an order of the Railroad Commission, issued on November 13, 1933, directing plaintiff to reduce its gas rates applicable to its natural gas service. The rates, fixed by the commission upon proceedings instituted upon its motion, are assailed as confiscatory.

Upon its bill of complaint and affidavits, plaintiff moves for an interlocutory injunction. Defendants, in opposition thereto, file a verified answer and affidavits.

In its decision, the commission found, as stated in its brief, "that the fair rate base applicable to the plaintiff's gas properties for the purpose of testing the rates for the future was $105,000,000. A net return of $7,000,000 (approximately 6⅔ per cent) on said rate base was found to be a reasonable return." And it further states in its brief that "the order reduced the gross revenues of the company by $2,100,000, and its net revenues by $1,648,238; that the net revenue available under the new rates would be $7,096,643 or 6.76 per cent return on the $105,000,000 rate base. This projected net return under the new rates is before making any allowance for increased revenues resulting from the stimulation of sales under the reduced rates. Revenues will unquestionably increase under the lower rates. * * * But for the reduction of rates the return to the company under the old level of rates would have been $8,744,881, or 8.33 per cent on the said rate base."

Plaintiff alleges that the fair value of its properties is in excess of $114,000,000; that the historical value is in excess of $117,000,000.

Plaintiff contends that the rates prescribed by the commission are "insufficient to yield a fair or reasonable return upon the fair value of plaintiff's properties used and useful in furnishing gas to the public, and therefore said order deprives the plaintiff of its property without due process of law and takes plaintiff's property for public use without just compensation in violation of the Fourteenth Amendment to the Constitution of the United States." And, in its complaint, plaintiff alleges that "said decision and order is without evidence to support it in that the Commission failed and refused to give due or any weight or effect to the reproduction cost of the property of plaintiff used and useful in the service of furnishing gas to the public and failed and refused to give due or any weight or effect to competent evidence of such reproduction cost; and that, in fixing the rate base, the Commission gave weight and effect solely to the historical cost of plaintiff's said property."

The commission rejected the reproduction cost estimates of the plaintiff, did not have any detailed estimates of reproduction cost before it, and did not determine the reproduction cost of plaintiff's property. In that regard, the commission, in its decision, stated as follows:

"Testimony regarding the cost to reproduce the properties here under consideration was presented by the Company's valuation engineer on several price bases, all being developed through the application of price translation factors, and not through the application of appropriate prices to an inven-

tory of the property. In each pricing period offered the estimate to reproduce was higher than the historical cost. For the first six months' period of 1933 the reproduction cost was shown as 8 per cent higher than historical. A perusal of price trend charts introduced by the Company elsewhere in the proceedings indicate that the estimate must be in error. It is not conceivable that a property, 80 per cent of which has been constructed in the high price period following 1919, could not be reproduced for a lesser cost under prices prevailing in the first 6 months of 1933. Witness for the City of San Francisco clearly indicated why the estimate was erroneous when he showed that the method used ignored certain factors tending in later years to decrease cost, such as improvement in construction materials and methods, increased use of mechanical equipment and a lessening in the width of the excavations and pavement cut. The estimates of cost to reproduce are not at all convincing and cannot be of positive value in this proceeding."

The plaintiff further contends that the commission refused to include the going concern value of its properties in the rate base, and made no allowance for a return thereon; that the commission's order will provide a return which will not exceed 4.21 per cent. upon the fair value of its properties, whereas a return of less than 8 per cent. will be confiscatory.

The commission made no direct allowance for going concern value. In that regard the commission in its decision stated:

"The consulting engineer for Oakland testified that under the practice of the Commission in the allowance of development cost in operating expenses and of return above the cost of money going value was fully accounted for and no additional amount should be added.

"The testimony of the Company on going value was put in by its vice-president and executive engineer, who qualified as having had a general engineering experience prior to 1912 when he became valuation engineer and later executive engineer and vice-president for the Company; an extended experience in rate matters; studied and followed the decisions of commissions and courts in the analysis and presentation of development cost and going value; has been familiar with the terms and conditions of the acquisition by the Company of various properties and has had major responsibility in the conducting of many of the negotiations for the purchase or sale of such properties of the Company. The fact that during the major part of his mature life he has been an employee and officer of the Company, that his testimony was in no way corroborated, and that the transfer of properties with which he was familiar are all Company properties, practically all of which were acquisitions to extend territory or remove competition, renders his testimony of $12,000,000 for going concern of the natural gas service of very doubtful probative value. The testimony of other Company witnesses was conflicting with a determination for a substantial going value. A dismal picture for the future was painted in the matter of new business and revenue. The Company's expert called to testify regarding the probabilities of the principal natural gas field supplying this territory only would allow a life of 15 years, 3 years of which has already passed. It is difficult to imagine a purchaser putting up anything for going value under such prospects.

"The Company's position regarding the claim for going value seems a little uncertain. Counsel in Chief indicated that it was not expected the Commission would allow going value, while associate counsel contended that going value should be allowed.

"Even if going value could be found here in a definite amount there are no proper elements of physical value found to which it might be related to obtain fair value. Under the record there is no tenable depreciated reproduction cost figure and it is wholly inconsistent to attempt to relate going value to undepreciated historical cost.

"However, the Commission here will use more optimism than the Company has shown and accredit this property with a reasonable recognition of going value through allowance as an operating expense of over $800,000 a year for development expense, which is approximately 7 per cent on the Company's claimed going value figure, and by the additional allowance of return over reasonable cost of money."

It is essential that going concern value be included in the estimate of the fair value of the property upon which rates are to be fixed.

In its decision, under the subheading, "Value, Rate Base and Return," the commission says: "During its entire history in establishing reasonable rates for utilities similar to this Company, to determine a proper rate base this Commission has used the actual or estimated historical costs of the properties undepreciated, with land at the present market value. Consistent with this, it has

used the sinking fund method to determine the allowance for depreciation to be included in operating expenses."

This theory, which was followed by the commission in determining a rate base, has been repudiated by the Supreme Court. See Bluefield Water Works, etc., Co. v. Public Service Commission, 262 U. S. 679, 43 S. Ct. 675, 67 L. Ed. 1176; Missouri ex rel. Southwestern Bell Telephone Co. v. Public Service Commission, 262 U. S. 276, 43 S. Ct. 544, 67 L. Ed. 981, 31 A. L. R. 807; McCardle v. Indianapolis Water Co., 272 U. S. 400, 47 S. Ct. 144, 71 L. Ed. 316; Denver v. Denver Union Water Co., 246 U. S. 178, 38 S. Ct. 278, 62 L. Ed. 649; Los Angeles Gas & Electric Corp. v. Railroad Commission, 289 U. S. 287, 53 S. Ct. 637, 77 L. Ed. 1180; Wichita Gas Co. v. Public Service Commission (D. C.) 3 F. Supp. 722; United Railways & Electric Co. v. West, 280 U. S. 234, 50 S. Ct. 123, 74 L. Ed. 390.

It appears from the affidavits that the plaintiff claims an annual depreciation of $4,865,698. The commission allowed $1,769,119 for annual depreciation. In order to present in part the issue in that regard, we quote from the affidavit of the president of the plaintiff corporation as follows:

"That the actual fact is that in 1930 the net earnings of the company from its gas business, without any charge against revenue for cut-over or extraordinary leakage prevention expense, was $6,370,414, or not more than 6.65% of the historical cost of the Company's physical properties alone as of that time. That the amount of such expenses incurred by the Company in that year was $1,723,883, and if such expenses were charged against revenue as suggested by the Commission should have been done, it would have reduced the net return to the Company from its gas business of that year to $4,646,531, or 4.84% of the historical cost of the Company's properties alone as of that time.

"That in estimating the return to the Company under the new rates fixed by the Commission, the Commission allowed as a charge against revenue an annual depreciation allowance of only $1,769,119, or less than 1.8% upon the historical cost of the depreciable property of the Company as estimated by the Commission. That as shown in more detail by the affidavit of G. M. Thomas, filed herewith, such amount is insufficient to reimburse the Company for the cost of its properties as the same are retired from time to time by reason of normal obsolescence or age. That, in particular, of the properties of the Company used and useful in its gas business, properties having a cost in excess of $18,000,000 are dependent for their continued usefulness upon the continuance of the supply of natural gas. That the continuance of the Company's supply of natural gas is dependent upon the life of a single field, to-wit: the Kettleman Field. That there is no other known source of supply for the territory served by the Company that is both available and adequate to meet the requirements of that territory. That the life of said Kettleman Field is uncertain and the said properties of the Company, dependent for their usefulness upon a continued supply to the Company of natural gas, are subject to a special risk and hazard by reason thereof. That the Commission refused to take such risk or hazard into consideration in determining the depreciation allowance reasonably to be made to the Company, and fixed a depreciation allowance on the properties subject to said risk and hazard solely upon the basis of their having an expected life equal to their physical life.

"That the depreciation allowance estimated by the Commission was estimated by it upon a sinking fund basis, with interest at 6% per year. That estimating upon the same basis the annual depreciation allowance necessary in order to reimburse the Company for the cost of its properties as the same are retired from time to time by reason of normal obsolescence or age, the amount of such depreciation allowance is not less than $2,423,878, as contrasted with the amount of $1,759,119 allowed by the Commission."

Another issue is as to the fair return that should be allowed upon the fair value of plaintiff's property. The company claims that returns should not be less than 8 per cent. on the fair value of the property. The commission allowed 6⅔ per cent., while the rate allowed to the Los Angeles Gas & Electric Co. in the case considered by the Supreme Court in Los Angeles Gas & Electric Corp. v. Railroad Commission, 289 U. S. 287, 53 S. Ct. 637, 77 L. Ed. 1180, supra, was 7.7 per cent. on the historical cost, and 7 per cent. on the fair value. There is no evidence offered on the hearing of the motion for an interlocutory injunction of such a change in conditions as would make it clear that a lower rate of interest was justified. While we refrain from expressing an opinion at this time as to the proper rate of return upon the fair value of plaintiff's property, it is clearly doubtful whether or not the rate of 6⅔ per cent. is sufficient to produce a fair return upon the fair value of plaintiff's property.

It is unnecessary to further analyze or to enter upon a detailed discussion of the figures comprising the rate base presented in the record and the contradictory affidavits filed at this hearing. Suffice it to say that upon consideration of the entire matter we are in grave doubt as to whether or not the evidence supports the commission's order. And, as the commission has departed from the rules laid down by the Supreme Court for the determination of a proper rate base, a hearing of the case de novo is inescapable. In such a situation, it becomes our duty to grant the motion for an interlocutory injunction. Such course is approved in Ohio Oil Co. v. Conway, 279 U. S. 813, 815, 49 S. Ct. 256, 73 L. Ed. 972, in which case the Supreme Court said: "Where the questions presented by an application for an interlocutory injunction are grave, and the injury to the moving party will be certain and irreparable, if the application be denied and the final decree be in his favor, while if the injunction be granted the injury to the opposing party, even if the final decree be in his favor, will be inconsiderable, or may be adequately indemnified by a bond, the injunction usually will be granted. Love v. Atchison, Topeka & Santa Fe R. Co. (C. C. A.) 185 F. 321, 331, 332." See, also, Prendergast v. New York Tel. Co., 262 U. S. 43, 43 S. Ct. 466, 67 L. Ed. 853; City of Amarillo v. Southwestern Tel. & Teleg. Co. (C. C. A.) 253 F. 638; Monroe Gaslight & Fuel Co. v. Michigan Public Utilities Commission (D. C.) 292 F. 139, 143.

We therefore conclude that the interlocutory injunction should issue, and it is so ordered.