No. 28,323.

GEORGE S. RUSCO, *Appellant,* v. J. W. DORSEY DEGOOD and L. D. REINHOLD, *Appellees.*

(275 Pac. 201.)

Opinion filed March 9, 1929.

*John L. Finley,* of St. Francis, *James E. Larimer* and *Eugene S. Quinton,* both of Topeka, for the appellant.

*C. A. P. Falconer,* of Atwood, *W. S. Langmade, W. T. Wolfe,* both of Oberlin, and *Leigh D. Dowling,* of St. Francis, for the appellees.

The opinion of the court was delivered by

HOPKINS, J.: This controversy involves the question whether a deed was in fact a mortgage. The action was one for possession of a ranch (840 acres) in Cheyenne county. It was brought by George S. Rusco, claiming to be owner and landlord, against L. D. Reinhold, tenant, and against J. W. Dorsey DeGood, to have a deed purporting to convey the ranch to the latter, declared to be a mortgage. Reinhold answered denying the landlord's title, admitting nonpayment of rent under a lease through which he held, and claiming that DeGood was the owner of the ranch and entitled to the rent. The plaintiff admitted execution of the deed to DeGood, but claimed it was in fact a mortgage and DeGood a mortgagee. DeGood answered, claiming to be owner of the ranch by the deed to him. The court sustained a demurrer to plaintiff's evidence, and he appeals.

The facts disclosed by the evidence were substantially these: The

land in controversy was owned by one Devore, subject to a mortgage held by William Buck. Charles Boyington held a contract of purchase from Devore, subject to the mortgage. Boyington applied to DeGood for a loan of $25,000 to be secured by a mortgage upon the land. There is some controversy as to the facts, but the plaintiff claims that DeGood agreed to loan the money to Boyington but demanded in lieu of a mortgage that the legal title in Devore under the contract of purchase should be conveyed directly from Devore to him (DeGood). DeGood further agreed as part of the transaction to lease the property to Boyington. Transfers of the property were made; deed to DeGood and lease from DeGood to Boyington. Boyington leased the premises to Reinhold May 31, 1923. Subsequently thereto (January 6, 1925) Boyington assigned and transferred his interest in the DeGood lease and also executed a quitclaim deed to Rusco, the plaintiff. Material parts of the lease from DeGood to Boyington read:

"This lease made this 6th day of March, 1922, by J. W. DeGood of the first part, to Charles Boyington, of the second part.

"Witnesseth, that the said party of the first part, in consideration of the rents, covenants and agreements of the said party of the second part, hereinafter set forth, does by these presents, grant, lease, and rent, to the said party of the second part, the following described property, situated in the county of Cheyenne and state of Kansas. . . .

"The party of the first part gives the party of the second part the exclusive option to buy said land at any time during the term of this lease for the purchase price of $25,000 cash, to be paid in full at the time of purchase.

"It is further agreed that if on or before the termination of this lease, the party of the second part pays the party of the first part, $15,000 or more, then all the terms of this lease to be extended three years from said payment or the termination of this lease, after which the party of the second part shall have the same option to purchase for the sum of $10,000 or less, according to the amount paid on the aforesaid $25,000.

"To have and to hold the same unto the said party of the second part, from the first day of March, 1922, to the first day of March, 1927.

"And the said party of the second part, in consideration of the leasing of the premises, as above set forth, covenants and agrees with the said party of the first part to pay the said party of the first part, his heirs or assigns, as rent for the same, the semiannual rent or sum of eight hundred seventy-five dollars, in ten semiannual payments, as follows, to wit: The first year's rent of $1,750 is paid, receipt whereof is hereby acknowledged. And eight hundred seventy-five dollars September 1, 1923, and $875 each six months thereafter, until all payments provided for are paid. And in addition to said rent pay all taxes assessed against said land during the term of this lease. Party of the second part agrees to pay all expenses of executing and stamping any deeds, notes or mortgages in connection with this lease.

"Hereby waiving the benefit of the exemption, valuation and appraisement laws of said state of Kansas to secure the payment thereof.

"The said party of the second part further covenants with said party of the first part, that at the expiration of the time mentioned in this lease, to give peaceable possession of the said premises to said party of the first part, in as good a condition as they now are, the usual wear, unavoidable accidents and loss by fire excepted, and will not make or suffer any waste thereof, nor lease, nor underlet, nor permit any other person or persons to occupy the same, or make or suffer to be made any alteration therein, without the consent of said party of the first part in writing having first been obtained, and not use or occupy said premises for any business or thing deemed extra hazardous on account of fire; and that upon violation of or default in any of the preceding covenants and provisions, or on the nonpayment of the rent, as aforesaid, the said party may, at his election, either distrain for said rent due, or declare this lease at an end, and recover the same as if held by forcible detainer, the said party of the second part hereby waiving any notice of such election or any demand for the possession of said premises.

"The covenants herein shall extend to and be binding upon the heirs, executors and administrators of the parties of this lease.

"In witness whereof, the said parties have hereunto set their hands, the day and year first above written. J. W. DeGood,

Charles Boyington.

"It is further agreed that the party of the second part has the privilege of paying any part of said purchase price at any rent-paying date and any such payment shall draw interest at the rate of seven per cent per annum and said interest be deducted from all subsequent rent payments."

The assignment from Boyington to Rusco reads:

"For and in consideration of one dollar and other valuable consideration, I, the undersigned, hereby sell, assign and transfer, and set over to Geo. S. Rusco, of St. Francis, Kan., all my right, title, interest, equity and estate in and to the within lease and hereby authorize said assignee to carry into effect in full, all the provisions of the within lease. Chas. Boyington."

Material parts of the deed from Boyington to Rusco read:

"This indenture, made this 6th day of January, in the year of our Lord one thousand nine hundred and twenty-five, between Charles Boyington and Clara Boyington, husband and wife, of ———, in the county of Cheyenne and state of Kansas, of the first part, and Geo. S. Rusco of the county of Cheyenne and state of Kansas, of the second part:

"Witnesseth, that the said parties of the first part, in consideration of the sum of one dollar and other valuable consideration, to them duly paid, have sold, and by these presents do remise, release and quitclaim unto the said party of the second part, heirs and assigns, forever, all that tract or parcel of land situated in the county of Cheyenne and state of Kansas and described as follows:  . . .

"The parties of the first part covenant that at the date hereof they have

executed no conveyance or other instrument of writing whatsoever affecting the said real estate, which does not now appear of record in the office of the register of deeds of said county and state, with the appurtenances, and all the estate, title and interest of the said parties of the first part therein; to have and to hold all and singular the above-described premises, together with the appurtenances, unto the said party of the second part, heirs and assigns forever."

The defendants contend that the instruments on their face showed a conveyance of the property to DeGood with an option only from DeGood to Boyington to purchase the property within a specified time, and in the interim the property to be leased to Boyington, and that parol evidence to vary the terms of such contracts was incompetent. Considerable testimony was offered by the plaintiff and rejected by the court upon the theory advanced by defendants. Such testimony, however, was not brought into the record on the hearing of the motion for a new trial as required by the statute and its rejection is therefore not available as error. (R. S. 60-3004; *State v. Snyder*, 127 Kan. 7, 272 Pac. 169; *Newton v. Newton*, 127 Kan. 624, 274 Pac. 247.) The question for our consideration is whether the plaintiff was entitled to a submission of the case to the jury upon the evidence introduced; that is, whether the court erred in sustaining the demurrer to plaintiff's evidence.

There was evidence showing a warranty deed, C. G. Devore and wife to DeGood, including the land in controversy; agreement of purchase by Boyington from Devore, dated February 17, 1920; Devore sells to Boyington about 900 acres of land, the subject of this action; "deed to be delivered . . . when all payments are made down to the first mortgage." In consideration of which Boyington covenanted and agreed to pay unto Devore "the sum of $39,600, as follows, to wit: $5,000 due and payable February 17, this day; $10,000 payable the first of March, 1920; the balance (excluding a first mortgage now against said 880 acres) of $9,200 payable within ninety days from the date of this contract, or at such time as shall be agreed on by the above two parties, same to bear interest at the rate of seven per cent per annum from date. Party of the second part, Boyington, hereby assumes a first mortgage on the above lands now owned by Mr. William Buck, same payable in five years with interest at seven per cent."

Boyington testified:

"I got possession of this described land on the first of March, 1920, under this agreement. . . . The land described in that agreement had no im-

provements except fences around part of it. It was mostly bottom land, laying both sides of the river, with perhaps sixty acres of hill land. There was about forty acres in cultivation. In 1920 I did some fencing and broke out something over 100 to 150 acres, and put on from $150 to $200 worth of fencing. The breaking of the new land was probably of the value of $400. I paid $5,000 at the time I got this contract, and all together paid $15,000 upon the contract. I paid that shortly after going into possession. Besides breaking 140 acres I put about 80 acres into wheat and 15 acres into alfalfa. I got a fair stand of alfalfa. I thought sowing the alfalfa would raise the value about $50 an acre. In 1921 I broke out more of the land, probably 30 acres, and built a five-room house of lumber and cement upon the land, the cost of which was about $2,000. I also built a barn that cost about $500. It was made of lumber and cement. I also, during that year, built corrals for the cattle, costing probably $100. Also improved by constructing wells; also put in about 35 acres in alfalfa, which increased its value from $25 to $30 an acre. I also sowed barley and kafir corn and built a small horse barn and a hog house, which cost me about $800. In the year 1922 I had not paid off the mortgage of $15,000 and it was due, I believe, in March. . . . I talked with Devore and had arrangements with him early in the winter. . . . I had a talk with DeGood with reference to this land, . . . in this contract of sale, with Devore. . . .

"Q. Where was that conversation with Mr. DeGood? A. In his mill. . . .

"Q. What was the conversation? Go ahead and state the conversation as near as you can detail it in your recollection. A. I asked Mr. DeGood first if he wouldn't go in a half interest with me on the place, and stock it proper with cattle and he said he would think about it, and later we talked it over at different times how to get the place stocked. . . . I had conversations at other times with him. We talked about it at different times. At this first conversation I first asked him about taking a partner in and he said he would think about it. . . . I came back to the mill to see Mr. DeGood about it. There was no one present except DeGood and myself, and DeGood said he could not go in partnership but he would see about getting money for me. We talked about that. That is about all the second time. In a couple of weeks I went back again to the mill and DeGood and I talked at that time. I asked him if he could give me a loan on the place and he said he could and explained it to me how he could make a loan. . . . I told Mr. DeGood I needed a loan of $25,000; $15,000 to pay the Buck note and mortgage and some to pay Mr. Devore and have some to buy cattle with. He said that could be arranged he thought all right, and he told me how he could arrange it; that he couldn't loan me the money outright unless he got ten per cent, and I knew I couldn't afford to pay that much. He gave as his reason that there would be taxes to pay on the mortgage and the rate of tax was so high it would leave him nothing for his loan. He said the taxes at that time would be about four per cent and that would leave him only three per cent on his money, but that he could make the arrangements if he could get the deed and give me an agreement. When I paid this money back to him I could have the deed. The land was to be mine. That was about all at that time until the deal was closed. I was living on the land at that time, in possession of it.

I think the next conversation I had with him we went to Mr. Kite's office and made the papers out and he told me at that time how he would fix the matter. That was the last conversation I had with him before we made out the papers. . . .

"Q. I am asking you to state what Mr. DeGood said with reference to the agreement that he would give you, what the terms of that was, what it was to be?

"THE COURT: Just state it in the language of the parties.

"A. That he would let me have $25,000 and pay $15,000 in five years and $10,000 in eight years. If I paid the $15,000 he would give me eight years for the last $10,000.

"Q. Go ahead and state what he said he would give you with reference to the terms of that agreement, what he would give you to show that. A. He would give me a written agreement.

"Q. Was that written agreement what you got with reference to paying him back this money? A. Yes, sir. . . . The deed from Devore to DeGood was delivered the same day at the same time we drew the papers up in Mr. Kite's office.

"(Cross-examination.) The deed was delivered to Mr. DeGood. . . .

"(Redirect examination.) I received money when this deed was made from Mr. DeGood at that time in the sum of $5,000. I gave Mr. Devore a check for $3,000 as a payment upon my contract, my note, with Devore. The agreement to pay Devore $3,000 on his contract was made the same day the deed was executed. . . . I had had a talk with Devore some two or three weeks before that. . . . It was agreed between Mr. Devore and myself that the money received from DeGood was to pay the Billy Buck note and mortgage. Devore and I talked about that and it was agreed it would be better for me if we could take the $15,000 and pay it. . . .

"Q. Was Mr. DeGood present at the time you arranged to pay the $3,000 to Devore? A. He was.

"Q. Was DeGood present when this conversation was had? A. He was.

"Q. Was he in the room at the time and sufficiently close to hear the conversation? A. He was.

"(Cross-examination.) Witness was shown exhibit C and testified that it was made at the time of the execution of the deed on March 6, 1922, in Mr. Kite's office; and that he, Boyington, remained in possession of the premises under this instrument about one year and a half."

Counsel for defendants interrogated Boyington:

"Q. Now, under the terms of this lease, I understood you to say that you paid the first year's rent by DeGood retaining it out of the purchase price, is that right? A. Yes, sir.

"(Redirect examination.) Q. Mr. Boyington, I will ask you with reference to this so-called lease, if there was any stamps furnished to put on the deed executed by Mr. Devore to Mr. DeGood—government revenue stamps? A. There was.

"Q. Who paid for those stamps? A. I did.

"Q. You know how much the stamps were on that deed, you remember now what the amount to be? A. I believe it was close to $30.

"Q. They took this out of the money that was paid to you at that time on this transaction, did they? A. Yes, sir.

"Q. A part of this lease reads: 'It is further agreed that the party of the second part has the privilege of paying any part of said purchase price at any rent-paying date, and any such payment shall draw interest at the rate of seven per cent per annum, and said interest be deducted from all subsequent rent payments.' Now, was that provision talked over between you and Mr. DeGood at the time that you arranged with him to furnish this $25,000? A. Yes, it was. . . . I told Mr. DeGood that I had a chance to lease this land to Reinhold. If it would be all right and satisfactory to him, Mr. DeGood, that I would lease the land to Reinhold for a certain sum and make up the difference—the difference of the rent price to Reinhold and the interest on this loan from DeGood—I mean the interest on this loan that I got from DeGood in the sum of $1,750.

"Q. Then, I will ask you, do you mean the difference between the money that you was getting from Mr. Reinhold and the seven per cent mentioned in the lease. A. Yes, I do. I made a computation as to the amount of seven per cent interest would be on $25,000. That would be $1,750. That first $1,750 was first taken out of this $25,000 at the time the papers were drawn."

Mr. C. G. Devore, called as a witness on behalf of the plaintiff, when shown the contract of purchase entered into by Boyington and Devore, stated that it was his signature and that the exhibit was the agreement between Boyington and himself. He testified:

"I have seen the contract before and operated under it. . . . I executed a deed under that contract, marked "Exhibit D," on or about the 6th day of March, 1922. The deed was made to Mr. G. W. Dorsey DeGood. I had a talk with reference to that deed with Mr. DeGood right at that time. Never talked with him about it before the execution of the deed. I had been spoken to, and talked about executing the deed to Mr. DeGood prior to that time in regard to the deed to Mr. DeGood. I was spoken to about it on the street here in St. Francis prior to the day upon which the deed was executed. If I remember correctly it was the latter part of February, 1922. . . .

"Q. Did you receive any consideration for the execution of this deed from anyone else? A. Yes.

"Q. Did you execute this deed, Mr. Devore, without any consideration whatever? A. No.

"Q. At whose solicitation did you execute this deed? A. Mr. Boyington's.

"Q. At anybody else's solicitation besides Mr. Boyington's, was anybody else joined in that? A. No. There was money due me at that time of the contract between Mr. Boyington and myself, and I received payment on that contract at that time from Mr. Boyington at the time I executed the deed. . . . At the time the deed was executed to Mr. DeGood the contract between Boyington and DeGood was executed and the Buck mortgage was

satisfied. I don't remember whether that was the day I got my check from Mr. Boyington for the $3,000. I got a check from him for $3,000 at the same time and Mr. DeGood paid over some money to Mr. Boyington. I don't remember the amount. I took a note from Mr. Boyington the same day or about that time. . . . I have got that note yet. . . . Mr. Boyington and I talked over the arrangements between us at that time with reference to terms of the agreements. We talked back and forth there. Boyington talked with Kite, DeGood and myself. That was before the papers were drawn up. We talked over the different clauses as we went along drawing them up—that is exhibit C, the agreement between DeGood and Boyington, the different clauses as it was being drawn up."

We are not unmindful of the rule that spreading the evidence at length upon the record is not good form. (*State v. Rose,* 124 Kan. 37, 257 Pac. 731, and citations.) But the question here is so sharply contested that it appears not improper to violate the rule. We are of the opinion the evidence received by the court was sufficient to require submission to the jury upon plaintiff's theory that the money procured from DeGood was a loan. Comment at length thereon is not necessary, but a few observations are not amiss. For instance, Boyington was purchasing the land in controversy from Devore for $39,000, a transaction with which DeGood was familiar. DeGood was putting up only $5,000 at the time the deed was executed, $3,000 of which he knew went to Devore. Also, DeGood must have known that Boyington was occupying and improving the land in all respects as though he owned it, not as a mere tenant or lessee.

It is contended by the defendants that the written instruments between the parties disclose only a conveyance and an option by Boyington to buy back; that there was no debt owing by Boyington to DeGood, which under the authorities is the true test. (*Fabrique v. Mining Co.,* 69 Kan. 733, 77 Pac. 584; *Hoyt v. National Bank,* 115 Kan. 167, 222 Pac. 127; *Lincoln State Bank v. Breazier,* 122 Kan. 423, 251 Pac. 1080.) Aside from the oral testimony we do not regard the language of the lease itself as free from the interpretation claimed by the plaintiff. For instance, it states that "the second party waives the benefit of the exemption, valuation and appraisement laws to secure the payment thereof." That is, payment of all of the sums stipulated in the contract. It also provides that upon violation of any of the covenants and provisions the first party may distrain for his rent due and recover the same as if held by forcible detainer.

As against a demurrer the plaintiff was entitled to every fair and reasonable inference which might be drawn from the evidence. In *Rowan v. Rosenthal,* 113 Kan. 604, 215 Pac. 1008, it was said:

"A demurrer to the evidence of plaintiff should not be sustained unless the court is able to say that admitting every fact that is proven which is favorable to the plaintiff, and admitting every fact that the jury might fairly and logically infer from the evidence favorable to the plaintiff, still, the plaintiff has failed to make out some one or more of the material facts of his case." (Syl.)

What was said in the Rowan case had been stated before, and has been reiterated many times since that decision. (*Walker v. Eckhardt,* 122 Kan. 453, 251 Pac. 1093; *Lindenbaum v. Kamen,* 122 Kan. 775, 253 Pac. 409.)

The judgment is reversed and the cause remanded for further proceedings.