No. 30,444.

CITIES SERVICE COMPANY, *Appellee*, v. H. W. KOENEKE, as Bank Commissioner, etc., and CARL NEWCOMER, as Special Assistant Bank Commissioner, etc., *Appellants*.

No. 31,048.

THE STATE OF KANSAS, ex rel. H. W. KOENEKE, as Bank Commissioner, etc., *Appellee*, v. HENRY L. DOHERTY, a Sole Trader, doing business as HENRY L. DOHERTY & COMPANY, and CITIES SERVICE COMPANY, *Appellants*.

(20 P. 2d 460.)

8

Opinion filed March 11, 1933.

In case No. 30,444, *Roland Boynton,* attorney-general, and *R. O. Mason,* assistant attorney-general, for the appellants; *Clad Hamilton, Donald A. Campbell* and *Frank Flack,* all of Topeka, of counsel.

*Fred Robertson,* of Kansas City, *Robert Stone, James A. McClure, Robert L. Webb, Beryl R. Johnson, Ralph W. Oman,* all of Topeka, and *Robert D. Garver,* of Kansas City, Mo., for the appellees.

In case No. 31,048, *Robert Stone, James A. McClure, Robert L. Webb,*

*Beryl R. Johnson, Ralph W. Oman,* all of Topeka, *Charles A. Frueauff, Watson B. Robinson, Robert S. Sloan,* all of New York, N. Y., and *Robert D. Garver,* of Kansas City, Mo., for the appellants.

*Roland Boynton,* attorney-general, *R. O. Mason,* assistant attorney-general, *Clad Hamilton, Donald A. Campbell* and *Frank Flack,* all of Topeka, for the appellee.

The opinion of the court was delivered by

DAWSON, J.: These appeals are from judgments of the district court of Shawnee county in which certain provisions of the Kansas securities act, familiarly known as the blue-sky law, were drawn in question.

In the first case the Cities Service Company, as plaintiff, sought and obtained a temporary injunction restraining the bank commissioner from enforcing an order made by him the effect of which was to terminate any right of plaintiff, its brokers, agents and salesmen, to sell its securities in this state.

In the second case the state, as plaintiff, sought and obtained a permanent injunction restraining defendants from selling securities of the Cities Service Company without a permit issued pursuant to section 6 of the blue-sky law. (R. S. 1931 Supp. 17-1228.)

The records in these cases are long. There is a good deal of moralizing in the briefs over the frenzied financing of Kreuger, Lowenstein, Foshay and Insull which have been chronicled in the press within recent years. All this might well receive the solicitous consideration of law-making bodies; but in litigation matters of such sort hinder rather than help, since judicial tribunals are primarily concerned with the law as it stands.

The facts of present concern are mainly these:

The Cities Service Company is a Delaware corporation chartered to engage in many and varied corporate activities. Its chief corporate business appears to be that of a holding company. It claims to own and control corporate assets of more than a thousand million dollars in value. It is the principal owner of the ultimate beneficial interest in 158 corporations in the United States, Canada, Mexico, South America and elsewhere. Many of these corporations are engaged in serving the public in various capacities. Some of these subsidiary corporations whose stock and bond ownership and ultimate domination are vested in the Cities Service Company, mediately or

immediately, are the local utilities which supply gas to the cities of Kansas City, Wichita, Newton and Hutchinson.

Henry L. Doherty is president of the Cities Service Company and, also, president of a number of its subsidiaries, one of which is a marketing agency designated the Cities Service Securities Company. In his individual capacity Doherty holds himself out as a trader and broker in securities of the Cities Service Company, or of the Cities Service Securities Company, or of both these companies.

For some time past Henry L. Doherty has held a broker's license issued by the bank commissioner, under R. S. 1931 Supp. 17-1230, authorizing him to sell securities of the Cities Service Company and associated companies listed on the New York Curb Market and elsewhere. Under the same section of the blue-sky law, upon proper showing of good character and payment of the proper fee, the bank commissioner has registered some 2,000 of Doherty's stock salesmen, all of whom are employees of some corporate subsidiary of the Cities Service Company.

On and prior to July 2, 1931, Doherty and his registered salesmen were engaged in selling various securities of the Cities Service Company listed on the Boston and Chicago Stock Exchanges and on the New York Curb Market, denominated: Preferred stock, cumulative; preference B stock, cumulative; preference B B stock, cumulative; five per cent noncumulative stock; common stock.

On July 2, 1931, the assistant bank commissioner, assigned by his superior officer to the work of supervising the business of dealing in blue-sky securities, without previous notice to Doherty or any intimation to him of any complaint concerning his work as a licensed broker or of any delinquency on the part of his registered salesmen, or of any complaint in respect to the securities being sold in Kansas under his broker's license, telegraphed Doherty as follows:

"TOPEKA, KAN., July 2, 1931.
*"Henry L. Doherty & Company, 60 Wall Street, New York City, N. Y.:*

"By authority vested in this department under chapter one hundred and forty-two of the Session Laws of nineteen hundred thirty-one, we are withdrawing approval of all Cities Service stock listed on the New York Curb Exchange excepting first preferred stock, and after July third such security shall not be entitled to the benefit of exemption or sale in Kansas.

"CARL NEWCOMER,
*"Special Assistant Bank Commissioner*
*in Charge of Securities."*

At the same time the following telegram was dispatched to New York:

"TOPEKA, KAN., July 2, 1931.

*"New York Curb Exchange, New York City, N. Y.:*

"Effective July third we are withdrawing approval of all Cities Service issues listed on your exchange excepting first preferred stop this action is taken by authority given this department under chapter one hundred forty-two Session Laws of nineteen hundred thirty-one.

"CARL NEWCOMER,

*"Special Assistant Bank Commissioner in Charge of Securities."*

These communications brought counsel for the Cities Service Company to the scene in short order; and on July 3, 1931, case No. 30,444 was begun to restrain the bank commissioner and his assistant from putting the order into effect.

Plaintiff alleged that for more than ten years, under authority of law, through brokers, agents and salesmen duly licensed therefor, its securities had been sold within this state, that such securities were listed on the Chicago Stock Exchange, the Boston Stock Exchange and the New York Curb Market; and that plaintiff's securities thus sold were exempt from the provisions of the blue-sky law.

Plaintiff further alleged that the action of defendants on July 2, 1931, was without intimation or notice and without a hearing, that it was taken arbitrarily, capriciously and without just cause or excuse, and that it was perpetrated as a part of a plan of the governor and other public officials to coerce certain of plaintiff's subsidiary companies doing business in Kansas to reduce their utility rates and to accede to the governor's demand to that effect.

Plaintiff also alleged that its right to continue to sell its securities in Kansas without unreasonable interference was of substantial value, that if prevented from thus selling them plaintiff would suffer irreparable injury for which it had no adequate remedy at law; and that if any provision of the blue-sky law were construed to sanction the action of the defendants, such provision was unconstitutional and void, and that the result of defendants' conduct constituted a taking of plaintiff's property without due process of law and a denial to it of the equal protection of the law guaranteed by the state constitution and the fourteenth amendment.

A restraining order was issued out of hand at plaintiff's behest, and a hearing on plaintiff's application for a temporary injunction

12

was held on July 3, at which time an amended petition was filed amplifying the allegations of plaintiff's original petition and correcting certain inaccuracies therein. On July 14 defendants filed their answers, admitting the existence of a controversy between some of plaintiff's subsidiaries and the public service commission respecting utilities rates, and that the governor had undertaken to negotiate a settlement of such controversy; but defendants alleged that their telegraphic communication to Doherty on July 2 had no relation thereto and was not inspired by the governor nor the public service commission—

"But the defendant believes that a large amount of stock has been sold to citizens of this state and that they have suffered very great losses through the purchase of said stocks.

. . . . . . . . . . . .

"Further answering, this defendant states that for a period of at least two years complaints have been received by the banking department respecting the Cities Service Company, both with respect to the securities sold by that company and with respect to its methods of doing business. That prior to the enactment of Session Laws of Kansas, 1931, chapter 142, what is known as the blue-sky department of the bank commissioner's office had no control or authority over the Cities Service Company, as the laws were then interpreted, and therefore said company sold its securities without let or hindrance in so far as said department was concerned.

"But this defendant avers that upon the enactment of Session Laws of 1929, chapter 140, the department was expressly authorized, under section 8 of said law (R. S. 1931 Supp. 17-1230), to require the registration of a broker selling securities, whether exempted under section 2 of said act or not.

"In this situation correspondence and negotiation was begun about January 1, 1930, with representatives of Henry L. Doherty, doing business as Henry L. Doherty & Company, 60 Wall Street, New York, in an effort to secure from him an observance and compliance with the law. The effort proceeded slowly and unsatisfactorily. Information desired and required by the bank commissioner was not and never has been furnished. No application for registration has ever been verified by Henry L. Doherty. The whole course of the negotiation was such as to create in the mind of this defendant a doubt as to the business ethics of Henry L. Doherty and as to the reasonable safety of such securities as he might offer to the public. . . .

"In the meantime this defendant at different times was receiving complaints of Cities Service stock from various sources. This defendant talked with the securities commissioners of various other states, who expressed grave doubt respecting the safety of the securities of the Cities Service Company."

Defendants also alleged that there appeared in a paper called the *Boston Financial News,* dated May 19, 1931, an article entitled:

"CITIES SERV., AWASH, NEEDS TO TRIM SAIL.

"Capital Structure Inundated with Issues—No Depreciation—
Stock Equities Hurt."

In the body of this article, among other statements germane to this caption, it was said:

"Building the Tower of Babel and starting an endless chain are kindergarten pastimes compared with what the Cities Service Co. is attempting to do."

Defendants alleged that they had been informed and believed that plaintiff had acquired the gas utilities serving the cities of Wichita, Hutchinson and Newton for prices aggregating $3,520,000 and later organized those utilities into corporate subsidiaries of plaintiff with issues of $3,300,000 of common stock, and bond and note issues of the same amount, thus capitalizing them at virtually twice their cost.

Defendant further alleged:

"This defendant states that over a period of many months unfavorable information and comment respecting Cities Service stock has reached him from so many sources that it is utterly impossible for him to give in detail a list of them. Some of the information may be incorrect. But it has all tended to influence an honest belief and conviction that all Cities Service stock listed on the New York Curb Exchange, excepting first preferred stock, is a hazardous and dangerous security for an investor to buy.

. . . . . . . . . . . . . . . .

"This defendant specifically denies that he or the bank commissioner of Kansas acted arbitrarily, capriciously and without just cause in withdrawing the exemption provided in Laws 1931, chapter 142, section 1 (clause 5); but states that he withdrew such exemption for the sole purpose of serving the public interest."

At the hearing on the application for a temporary injunction the evidence pro and con took a very wide range, and the construction and validity of certain provisions of the blue-sky law were sharply drawn in question. The trial judge, Hon. George H. Whitcomb, called his associate, Judge George A. Kline, to sit with him and join in the court's deliberations. The court found the issues in favor of plaintiff and granted the temporary injunction restraining defendants from enforcing their order of July 2, 1931, and from molesting plaintiff, its brokers, agents and salesmen in the sale of plaintiff's securities under guise of the order complained of, and from interfering with plaintiff's business on the various stock exchanges or the New York Curb Market by circulating or publishing statements in

reference to the attempted withdrawal of their approval of plaintiff's securities, and from injuring plaintiff's relations with the investing public as a result of defendants' purported order of July 2, 1931.

Defendants appeal from that judgment, specifying various errors, the most vital of which are:

"2. In holding invalid the provisos of subdivision 5 of section 1 of chapter 142, Laws of 1931 (R. S. 1931 Supp. 17-1224), authorizing withdrawal of the exemption therein provided.

"3. In holding the exemption provided by said subdivision 5 valid, after holding said provisos to be invalid."

The next case, No. 31,048, was a counter attack by the state against Doherty and the Cities Service Company predicated on the fact that the securities which they were selling in this state were those of a holding company and that they had not received "registration by qualification" as provided by sections 2 and 6 of the blue-sky law. (R. S. 1931 Supp. 17-1224, 17-1228.) The state alleged that such registration was a prerequisite to their being sold or offered for sale in this state, and an injunction against defendants to put a stop to such business was prayed for.

Doherty answered alleging that he held a broker's license issued by the state authorizing him to sell the securities of the Cities Service Company, that all such securities were officially listed on the stock exchanges of Chicago and Boston, and dealt in on the New York Curb Market; that each and every such sale was an isolated sale of outstanding securities and not of a new issue, and that every such sale was made by him as the representative of the owner, and that each such transaction was exempt from control of the blue-sky law by the specific terms of section 3. (R. S. 1931 Supp. 17-1225.)

Defendant Doherty further alleged that—

"If said clause 4 of section 2 of said chapter 140 of the Laws of Kansas, as amended (R. S. 1931 Supp. 17-1224), be interpreted or enforced as claimed by the plaintiff, it will contravene the due-process clause and the equal-protection clause of the fourteenth amendment to the constitution of the United States, the due-process and equal-protection clauses of the constitution of the state of Kansas and the bill of rights of the state of Kansas, . . ."

The answer further alleged that the proviso in section 2 of the blue-sky law was vague and indefinite in its terms and irreconcilable with the general provisions of the act, that it was incapable of interpretation and enforcement and void for indefiniteness and un-

certainty. A further infirmity in the proviso alleged was that it was unreasonable, arbitrary and oppressive, and made a classification of securities not based on their character but upon their ownership, which was a matter having no relation to the purpose of the statute.

The separate answer of the Cities Service Company contained some unimportant admissions and traversed the material allegations of plaintiff's petition. Later it filed an amended answer raising all the issues pleaded by its codefendant.

In this latter case, No. 31,048, when the state's motion for a temporary injunction came on for hearing, documentary evidence and depositions were presented at length, and the evidence theretofore adduced in case No. 30,444 was also admitted by stipulation. The trial judge called in his associate, Judge Otis L. Hungate, to participate in the court's deliberations, and at their conclusion the following findings were made:

"1. The position assumed by the Cities Service Company in this action regarding its character as a corporation and the sale of its stock is materially at variance with that taken in the action brought in this court by the company against the state bank commissioner, . . . (No. 30,444.)

"2. The court finds that defendant Cities Service Company is a holding company within the meaning of the proviso in subdivision 4 of section 2, chapter 142, Laws of 1931, in question here.

"3. At the time of the commencement of this action, the defendants themselves, or by their agents, were engaged, directly or indirectly, in selling and offering for sale stock of the Cities Service Company, in violation of the statute.

"4. When a corporation issues, and through its agents disposes of, its own stock to others, the property in the stock passes to such other parties. While not strictly a sale, the corporation, in effect, sells, and the other parties buy, and the transaction at least approximates a sale, and it should be held to come fairly within the purpose of the blue-sky law and subject to the regulation provided for by the proviso in question.

"5. Whatever may be said of the proviso in said subdivision 4, one thing seems to be certain, that the legislature intended to require registration, by qualification, of securities sold or offered for sale by a holding company, under section 6 of the blue-sky law.

"6. The proviso in question is an independent provision, substantive in character, and a part of the act as a whole. It brings securities sold and offered for sale by a holding company specifically under the provisions of section 6 of the act.

"7. The exemption given by section 2 is a privilege given as to certain securities, and it is competent for the legislature to except those sold or offered for sale by a holding company.

"8. A holding company is not deprived of the right to sell its securities in this state by the proviso in section 2, but is only required to register them by qualification. Ample provision is made for its securing permission to sell.

"9. There is a sufficient difference between a holding company and other companies and corporations, and their methods of business, to warrant the legislature in making a distinction between the securities offered or sold by the former and those of other companies and corporations, without violating any constitutional requirement.

"10. There seems to be reasonable ground for the statement that the sale of securities of a holding company would be more likely to work fraud upon the buying public, and to lead to imposition and unfair dealing, than the sale of the securities of an ordinary public utility corporation.

". . . Temporary injunction allowed."

By agreement the cause was submitted for final judgment on the evidence theretofore adduced, and also upon the files, evidence and exhibits in case No. 30,444.

Judgment was rendered in favor of the state, and a permanent injunction was granted whereby defendant Henry L. Doherty, sole trader doing business as Henry L. Doherty & Company, and defendant Cities Service Company, and their officers, agents and salesmen were permanently enjoined and restrained from selling, offering for sale, or soliciting the sale of any securities of the Cities Service Company until a permit was procured through registration by qualification as provided in section 6 of the blue-sky law. (R. S. 1931 Supp. 17-1228.)

Defendants appeal, assigning error in granting the temporary and permanent injunctions, and—

"In failing and refusing to hold that the defendants, and each of them, were deprived of the equal protection of the law and of due process of the law, and in refusing to hold that the proviso contained in subdivision 4, section 1, chapter 142, of the Laws of 1931 for the state of Kansas, is void and of no effect because it contravenes the due-process clause and the equal-protection clause of the fourteenth amendment of the constitution of the United States, and the bill of rights of the state of Kansas."

The blue-sky law (R. S. 1931 Supp. 17-1224), so far as here pertinent, reads:

"*Exempt Securities.* The provisions of this act, except as herein expressly provided, shall not apply to the following securities:

"(4) Any security issued or guaranteed either as to principal, interest or dividends, by a railroad or public service utility: *Provided,* That such corporation is subject to regulation or supervision either as to its rates and charges or as to the issue of its own securities by a public service commission, or any board, body or official having like powers, of the United States or of any

state or territory or insular possession of the United States, or of the District of Columbia, or of the Dominion of Canada, and all securities senior thereto: *Provided,* This act shall apply to all securities sold, or offered for sale, by a holding company holding and/or owning any security of any public service utility, and in no event shall such security be sold, or offered for sale, until a permit shall have been issued as provided by section 6 of this act. . . .

"(5) Securities officially listed on the New York, Boston or Chicago stock exchanges, or on any other recognized and responsible stock exchange which has been previously approved by the bank commissioner, and/or of the New York Curb Market, and which securities have been so listed pursuant to authorization by such exchange or curb market, and also all securities senior to any security so listed or represented by subscription rights which have been so listed, or indebtedness guaranteed by companies any stock of which is so listed, such securities to be exempt only so long as such listing shall remain in effect: *Provided, however,* That the bank commissioner may at any time withdraw his approval of any stock exchange, including the New York, Boston or Chicago exchanges and/or the New York Curb Market. *And provided further,* That the bank commissioner may at any time withdraw his approval of any security listed on the New York, Boston or Chicago stock exchanges and/or the New York Curb Market, or any other approved stock exchange, and thereafter such security shall not be entitled to the benefit of this exemption except upon further order of the bank commissioner." [Laws 1929, ch. 140, § 2; Laws 1931, ch. 142, § 1.]

R. S. 1931 Supp. 17-1226.

*"Certain securities not to be sold until registered.* No securities, not exempt by section 2 hereof (R. S. 1931 Supp. 17-1224), shall be sold within the state of Kansas except in a manner exempted by section 3 hereof [isolated sales, etc.], unless or until such securities have been registered as herein provided. Registration may be secured by application for registration as herein provided in section 5 hereof by notification or as provided in section 6 hereof by qualification. Such notification and qualification may be made by the issuer or any licensed broker and may pray that the registration be made for the applicant only or for the applicant and any designated licensed broker." [Laws 1929, ch. 140, § 4.]

The provision for "registration by notification" referred to as section 5 in the section just quoted is R. S. 1931 Supp. 17-1227. It is concerned with securities entitled to registration when certain formalities are complied with. "Registration by qualification," referred to in 17-1226, *supra,* as section 6, is R. S. 1931 Supp. 17-1228. It outlines in exacting procedure through which a permit to sell securities issued by a holding company (and others) may be obtained.

R. S. 1931 Supp. 17-1230 provides for the registration of brokers of securities, and requires that brokers be registered although the se-

curities they deal in may be wholly or partially exempt from the terms of R. S. 1931 Supp. 17-1224.

Plaintiffs, in case No. 30,444, brought their action under authority of section 26 of the act (R. S. 1931 Supp. 17-1248); and the state brought the second action, case No. 31,048, under authority of section 22 (R. S. 1931 Supp. 17-1244). If other provisions of this act need scrutiny they will be noted as we proceed.

Taking up the various points urged against these judgments in the order of their presentation, the appellant bank commissioner first contends that the Cities Service Company's petition did not state a cause of action. Let us see about that. Appellant's order of July 2, 1931, withdrawing approval of all Cities Service stock listed on the exchanges (except first preferred) was issued without complaint, notice or hearing. According to the allegations of the petition it came out of a clear sky, and that fact was so found by necessary implication in the trial court's ruling on the motion for a temporary injunction. Moreover, the bank commissioner sought to justify his action without a hearing under the provisos of subsection (5) of 17-1224, quoted above, the first of which confers upon him power to withdraw his approval of any stock exchange, including those of New York, Boston, and Chicago, of whose standing and repute the statute itself took cognizance. And the second proviso confers power on the bank commissioner at any time to withdraw his approval of any stock listed on the New York, Boston or Chicago Stock Exchanges or the New York Curb Market.

The trial court held these provisos invalid. Can there be a valid grant of such unqualified power conferred upon an administrative officer under our constitutional scheme of government? No standard prescribed to which the citizen should conform. No complaint, no notice, no opportunity to be heard in one's own defense. It simply pleased the defendant to exercise the statutory grant of power, and nothing can be done about it! Constitutional liberty has been won through the centuries along very different lines. As far back as the time of Seneca it was a cardinal prerequisite of all just government, although often disregarded in succeeding centuries, that there should be a hearing before condemnation:

> "Who hath adjudged of aught, one side unheard,
> Just though the judgment, were himself unjust."—
> Medea, Act II, 199-200.

In the famous Chinese laundry cases, *Yick Wo v. Hopkins*, 118 U. S. 356, a city ordinance conferred on the board of supervisors of San Francisco the power to grant or withhold licenses to operate laundries within the city. A license was refused to Yick Wo, a Chinaman, and he and others likewise denied licenses were arrested for operating their laundries without a license. Habeas corpus proceedings were unsuccessfully invoked before the supreme court of California and the circuit and district courts of the United States. The petitioners appealed to the supreme court of the United States, where these weighty observations on our governmental system were made:

"When we consider the nature and the theory of our institutions of government, the principles upon which they are supposed to rest, and review the history of their development, we are constrained to conclude that they do not mean to leave room for the play and action of purely personal and arbitrary power." (p. 369.)

Touching the city ordinances the court said:

"They seem intended to confer, and actually do confer, not a discretion to be exercised upon a consideration of the circumstances of each case, but a naked and arbitrary power to give or withhold consent, not only as to places, but as to persons. So that, if an applicant for such consent, being in every way a competent and qualified person, and having complied with every reasonable condition demanded by any public interest, should, failing to obtain the requisite consent of the supervisors to the prosecution of his business, apply for redress by the judicial process of mandamus, to require the supervisors to consider and act upon his case, it would be a sufficient answer for them to say that the law had conferred upon them authority to withhold their assent without reason and without responsibility. The power given to them is not confined to their discretion in the legal sense of that term, but is granted to their mere will. It is purely arbitrary, and acknowledges neither guidance nor restraint." (p. 366.)

"No reason whatever, except the will of the supervisors, is assigned why they (the petitioners) should not be permitted to carry on, in the accustomed manner, their harmless and useful occupation, on which they depend for a livelihood. . . . The imprisonment of the petitioners is, therefore, illegal, and they must be discharged." (p. 374.)

In our own case of *Smith v. Hosford*, 106 Kan. 363, 187 Pac. 685, a city ordinance which conferred upon the city commissioners the power to grant a permit to build a garage, or to refuse such a permit at will, was held to be unconstitutional and void because it assumed to clothe those officials with arbitrary power to be exercised merely at their will or caprice.

In *State, ex rel. Makris, v. Superior Court*, 113 Wash. 296, a city

ordinance of Tacoma authorized the commissioner of public safety and the city council, according to their own notions of what constituted a menace to public morality, health, peace or good order, to grant or withhold licenses to sell soft drinks and candy within the city. The ordinance prescribed no standard to which licensees should conform. The commissioner revoked the relator's license. The Washington supreme court, in an instructive opinion which cited the fourteenth amendment, *Yick Wo v. Hopkins*, supra, and other noted cases which form the basis of American law on this general subject, held the ordinance void. The syllabus reads:

"The equal protection clause of the federal constitution and the prohibition of the granting of special privileges, are violated by the provisions in Tacoma ordinance No. 7301 giving the commissioner of public safety, and the city council upon appeal, the arbitrary power, uncontrolled by any prescribed rule of action, to decide who may and may not engage in the business of selling candy and soft drinks, with discretionary power to revoke licenses for disorderly or immoral conduct or whenever the preservation of public morality, health or good order, in the judgment of the commissioner, renders it necessary."

See comprehensive note to the same case in 12 A. L. R. 1435; and Rose's notes to *Yick Wo v. Hopkins*, supra, in 30 L. Ed. 533.

In view of the precedents quoted and cited above it must be held that the provisos of subdivision (5) of R. S. 1931 Supp. 17-1224 confer arbitrary power upon the bank commissioner and his assistant, and that they violate the fourteenth amendment; and the trial court correctly ruled that they were unconstitutional and void.

Anticipating this conclusion, counsel for the bank commissioner contend that the logical corollary thereto is that a similar infirmity inheres in so much of subsection 5 of R. S. 1931 Supp. 17-1224 as declares that securities officially listed on the New York, Boston and Chicago Stock Exchanges and the New York Curb Market shall be exempt from the general provisions of the act. Manifestly the legislature deemed itself sufficiently informed of the standing and responsibility of these exchanges to relieve them of the necessity of coming hat-in-hand to an official of the Kansas blue-sky department for approval. As to "any other recognized and responsible stock exchange" the legislature decreed that its worthiness should be left to the sound discretion of the bank commissioner. The case of *State v. Crawford,* 104 Kan. 141, 177 Pac. 360, is cited as being at variance with this view. By no means. That was a case where criminal prosecutions had been instituted for violation of certain

regulations concerning electrical wiring prescribed by an association of fire underwriters. We held that the legislature could not delegate to such an unofficial organization the power to make obligatory rules concerning the care of property the breach of which would constitute a penal offense. The instant case is closer to that of *Jones v. Board of Medical Examination,* 111 Kan. 813, 208 Pac. 639, where it was held that the board of medical examiners might prescribe a rule that only graduates of medical colleges of the highest grade, "Class A," according to standards of the American Medical Association, would be permitted to take the examination for licenses to practice medicine. This writer disagreed with that decision but placed his dissent, in part, upon the want of a statute conferring power on the medical board to prescribe such a standard. In the matter of admissions to the bar the legislature itself took cognizance of the standard of excellence maintained in the law department of the state university, but vested this court with power to determine whether other law schools whose graduates applied for admission maintained standards equal to that of the university. We discern no constitutional infirmity in such legislation. And by analogy we can discover no infirmity in the statutory provision which relieves the bank commissioner of any concern about the standing and responsibility of the New York, Boston and Chicago Stock Exchanges. In *Stewart v. Brady,* 300 Ill. 425, the Illinois blue-sky law provided that securities should be considered as to be four classes, "A," "B," "C," and "D." Securities in Class A were exempted from the general supervisory regulations of the act, to wit: securities appearing—

"In any list of securities dealt in on the New York, Chicago, Boston, Baltimore, Philadelphia, Pittsburgh, Cleveland or Detroit Stock Exchange, respectively, pursuant to official authorization by such exchanges, respectively, and securities senior to any securities so appearing." (p. 433.)

The legality of such a classification was challenged, but the Illinois supreme court, in an opinion which is the leading authority on the subject, held that the classification was valid. The pertinent section of the syllabus, in part, reads:

"The Illinois securities act of 1919, in making distinction between securities listed on certain stock exchanges and in newspaper market reports and those not so listed, does not establish an arbitrary or unreasonable classification nor confer any special privileges on the exchanges enumerated nor upon the issuers or dealers in the securities listed, . . ." (¶ 12.)

In the opinion it was said:

"The assurance of the integrity of securities listed and dealt in on the stock exchanges is impliedly recognized by the supreme court of the United States in the case of *Hall v. Geiger-Jones Co.,* 242 U. S. 539, in considering the Ohio blue-sky law, where it is said in reference to that law: 'It extends to the general market something of the safeguards that are given to trading upon the exchanges and stock boards of the country—safeguards that experience has adopted as advantageous.' It was competent for the legislature to make this test, which has been justified by experience, a ground for exemption of securities in the act. In the case last cited a discrimination between securities which have and those which have not been published in regular market reports was held within the power of classification which a state has. The same court sustained a distinction in the Michigan statutes between securities which have and those which have not been listed in any standard manual of information approved by the commission. *Merrick v. Halsey & Co.,* 242 U. S. 568.

". . . The purpose of this paragraph and the next was to exempt securities which, by reason of their character, assured by their being listed on the stock exchange and by the public information in regard to them by reason of the publication of the market reports, were not within the evil which the legislature intended to remedy. . . . The stock exchanges in New York and Chicago are the greatest general stock markets in the country. The reports of sales on those exchanges are regularly published in newspapers of the state of Illinois and adjoining states, and this is not true of any other stock exchanges. The transactions of other exchanges are not so fully published except in the states in which they are situated. The legislature, in establishing a rule of evidence to determine the character of securities, was not obliged to include all stock exchanges and all newspapers, but might make a selection of newspapers and stock exchanges reasonably adapted to accomplish the purpose intended. With such reasonable selection the court cannot interfere." (pp. 440, 441, 442.)

Another point included in the specifications of error is that injunctive relief should not have been granted because the Cities Service Company was shown by the evidence to be a holding company, and in consequence it could not sell its securities in this state without compliance with the proviso of subsection 4 of R. S. 1931 Supp. 17-1224.

It would seem that if this legal point had been timely and squarely raised in this case the institution of the second case, No. 31,048, would have been unnecessary. There the vital matter involved is this precise question, and we will presently address ourselves to its solution.

The judgment in case No. 30,444 contains no error and it must be affirmed.

In the second case the state's cause of action was predicated on the fact that the Cities Service Company was a holding company, and as such it could not sell its securities without a permit. The statute, R. S. 1931 Supp. 17-1224, provides that the act shall not apply to securities of the United States, state securities, bonds of foreign governments with whom we have diplomatic relations, national bank securities, railroad and public utility securities issued under public supervision, and some others. Then it reads:

*"Provided,* This act *shall* apply to all securities sold, or offered for sale, by a holding company holding and/or owning any security of any public service utility, and in no event shall such security be sold, or offered for sale, until a permit shall have been issued as provided by section 6 of this act."

Section 6, just referred to, is R. S. 1931 Supp. 17-1228, which requires "registration by qualification" of all securities to which the act applies.

Counsel for defendants conceded at the trial that the Cities Service Company is a holding company. The term "holding company" is of recent origin. It is generally understood to mean a supercorporation which owns or at least controls such a dominant interest in one or more other corporations that it is enabled to dictate their policies through voting power. Bouvier's Law Dictionary (Rawle's 3d Rev., vol. 2, p. 1445) defines it as a corporation organized to hold the stock of other corporations. Thompson on Corporations (3d ed., vol. 5, p. 971) says:

"Such institutions are only fathered by states that have gone 'corporation mad.' A holding corporation, as the name indicates, is one organized for the purpose of owning and holding the stock of other corporations. Such a corporation may acquire a part or all of the capital stock of any other corporation either manufacturing or quasipublic; and it is managed by a board of directors, and as owner of a majority of the stock of any other corporation the board of directors of the latter becomes the mere instrument or pliant tool for carrying out the purposes and designs of the holding corporation; and where any one holding corporation owns all or a majority of the stock of several corporations organized for similar purposes, it can manage, control, and manipulate these as its designing directors may desire."

In Bonbright and Means' recent textbook, "The Holding Company," the authors have formulated the following as their definition:

"Any company, incorporated or unincorporated, which is in a position to control, or materially to influence, the management of one or more other companies by virtue, in part at least, of its ownership of securities in the other company or companies." (p. 10.)

The record, which includes tabulated exhibits, shows that the Cities Service Company is not only a holding company but one of stupendous size. One chart in the record lists 178 corporations and shows their relation to each other and to the Cities Service Company. The corporate activities of this colossus extend to all parts of this country and lap over into Canada, Mexico, South America, and, by inference at least, into Britain, Italy and elsewhere. The stock and bond issues of this aggregation run into astronomical figures. Cities Service Company's consolidated assets in 1930 were calculated at $1,282,624,854. Forty per cent of its holdings are in public utility corporations and sixty per cent in oil and natural gas companies. The common stock of defendant is bought and sold on the metropolitan exchanges, and its reputed current values are reported in the daily press.

It has been authoritatively settled that the state may supervise the sale of speculative securities and forbid their sale without a license authorizing such transactions. (*Hall v. Geiger-Jones Co.*, 242 U. S. 539; L. R. A. 1917F 514 and annotations 524 *et seq.; Caldwell v. Sioux Falls Stock Yards Co.*, 242 U. S. 559; *Merrick v. Halsey & Co.*, 242 U. S. 568.)

See, also, Anno.—Blue Sky Law, 15 A. L. R. 262; 24 A. L. R. 523; 27 A. L. R. 1169; 30 A. L. R. 1331; 40 A. L. R. 1014; 54 A. L. R. 499; 57 A. L. R. 1004.

It is contended, however, that the proviso which requires holding companies to procure a permit to sell their securities in conformity with the exacting requirements of the blue-sky act relating to "registration by qualification" while relieving other corporations of that onerous burden is unconstitutional. In support of this contention it is argued that this proviso creates an arbitrary and unreasonable classification, one that has no reasonable relation to the purposes of the statute. It is also argued that the proviso is so vague and uncertain in its terms that men of common intelligence must necessarily guess at its meaning and differ as to its application. In these two respects, the proviso is said to offend against the equal-protection and due-process clauses of the fourteenth amendment.

Answering the second of these contentions first, it does not seem to us that this proviso is vague and uncertain in its terms. The securities of a holding company cannot be sold or offered for sale in this state unless and until a permit is issued as prescribed by section 6

of the act. However potent other objections to the statute may be, the criticism as to its vagueness and uncertainty cannot be sustained.

Is the nature of a holding company's securities so distinct from those of other corporations as to justify the extension of strict governmental surveillance of their sale while trafficking in many other securities is less strictly regulated, as by "registration by notification" (R. S. 1931 Supp. 17-1227) or altogether exempt from governmental supervision? When we consider the colossal and complicated corporate structure of a holding company, and the utter impossibility of private investors knowing anything of the soundness of its investments or of the prudence and integrity of its management, it seems reasonable that the legislature should require an exacting scrutiny to be made of its affairs before permitting its securities to be sold in this state. It also seems reasonable that until we abandon the idea of conducting a free government the legislature should declare that officialdom of the blue-sky department need not be concerned about the purchase and sale of such securities as those named in the first part of section 2. (R. S. 1931 Supp. 17-1224.)

Under the blue-sky law it is theoretically possible—however it may result in actual practice—for a holding company's securities to be sold in Kansas through registration by qualification. (R. S. 1931 Supp. 17-1228.) This section requires a vast amount of data to be furnished to the bank commissioner and, apparently, contemplates that a thorough investigation of the fiscal, managerial and business affairs of the holding company shall be undertaken before its securities can be sold in this state. To administer the ordinary features of the blue-sky law the bank examiner is authorized to appoint a special assistant at an annual salary of $3,600, and such other "temporary assistants or clerks as he may from time to time deem necessary, and fix their compensation," (R. S. 1931 Supp. 17-1235) which shall not exceed $15 per day and actual expenses. (R. S. 1931 Supp. 17-1234.) To examine the statements and documents of a holding company, however, if the bank commissioner deems it advisable, "he shall make or have made a detailed inspection, examination, audit and investigation of the affairs of the makers or guarantors of such securities." To accomplish this he may appoint not exceeding three appraisers, and these three persons shall each receive a sum not to exceed $15 per day and necessary expenses. The record contains no direct evidence of the length of time it would take three

appraisers to make a thorough examination of the affairs of the Cities Service Company. Counsel for the company say it would cost $18,000,000. The assets of the company are of varied and complicated character and are located throughout a good share of the habitable globe. In 1930 they were estimated to be worth $1,-282,624,854. If these three appraisers worked diligently every day of the year except Sunday and each of them appraised $100,000 of the company's property per day, it would take them more than thirteen years to accomplish their task. If, however, the company should be dissatisfied with the results of such appraisement and the bank commissioner's report based thereon, it could demand a hearing before the charter board; and that tribunal, composed of the attorney-general, the secretary of state and the bank commissioner, "shall have power to make an independent investigation"—a purely theoretical remedy in a case like that of the Cities Service Company, for, unlike the three appraisers who could devote all their time to the investigation, the members of the charter board have other duties to perform, and their terms of office are only of two and four years' duration. An actual situation of this sort, not a mere theory, may arise whenever a supercorporation of the proportions of the Cities Service Company seeks a permit to sell its securities in this state. Either the blue-sky investigation will be a trifling formality designed to collect some fees and expenses from the applicant for a permit, or it will necessitate a thorough investigation of what is back of such securities to justify the confidence of the public whose investment patronage the applicant desires to obtain. If the assets of a holding company do not run far into the millions such an investigation as that contemplated by the statute can possibly be made by three $15-per-day investigators. Where, as here, the claimed assets are over a billion dollars, the statutory machinery for investigating the securities of the company is manifestly inadequate, and the examination contemplated by the statute is or may be a practical impossibility.

Such conclusion logically projects the question whether this statutory regulation, which is demonstrably inadequate and impracticable, is unconstitutional. We think not. Corporate powers of any sort cannot be exercised except pursuant to a specific grant. If the prerequisite conditions to their exercise are too onerous, the result is tantamount to a refusal to permit their exercise. The sale

of speculative securities is one form of corporate activity. That activity cannot be undertaken without a grant—a permit from the state. Since it would violate no provision of fundamental law if the legislature should say that speculative securities of a holding company having a billion dollars capitalization and surplus shall not be sold in this state, we discern no constitutional infraction of defendant's rights in the resulting situation.

Counsel for appellants invite a critical analysis of the related context to the proviso which we have been discussing. It is argued that it cannot overrule the other provisions of subdivision 5, quoted above, which exempt from registration by qualification such securities as are listed on the leading stock exchanges and the New York Curb Market. We cannot harmonize this suggested interpretation with the clear and specific language of the proviso that "in no event shall such security (of a holding company) be sold, or offered for sale, until a permit shall have been issued as provided by section 6 of this act."

Another contention is that appellant's securities are privileged to be sold as isolated sales under subdivision 1 of section 3 (R. S. 1931 Supp. 17-1225), which reads:

"(1) Any isolated sale of any security by the issuer or owner thereof, or by a representative for the account of such issuer or owner, such sale not being made in the course of repeated and successive sales of securities of the same issue by such issuer or owner or by such representative for the account of such issuer or owner."

This point appears to raise a question of fact. The evidence tended to show that Cities Service stock to the amount of $19,-000,000 has been sold to 29,000 persons in this state. Without rehearsing the other evidence that notable fact in itself is a practical refutation of the theory that appellants' sales of these securities were and are merely isolated transactions.

Yet another contention is that the Cities Service Company is not itself selling its securities in this state, and, therefore, the proviso does not apply to it. This contention, of course, raised a plain question of fact for the trial court to decide. This opinion has already extended beyond reasonable limits, and we will not undertake to summarize the evidence which tended to support the trial court's finding on that issue. (*Rusco v. DeGood*, 127 Kan. 708, 716, 275 Pac. 201.) We do not, of course, attach much significance to the inadvertent admission in the hurriedly prepared petition in case

No. 30,444. (*Leinbach v. Pickwick Greyhound Lines*, 135 Kan. 40, 57-58, 10 P. 2d 33.) On behalf of appellants it was made to appear that one of the Cities Service Company's many subsidiaries is the Cities Service Securities Company, through which, in collaboration with Henry L. Doherty & Company, the securities of the parent company are marketed; and there was evidence of a policy—which officials high in the service of the supercorporation but dimly understood—that the holding company should not make direct sales of its securities to the buying public. The manager of the securities department of Henry L. Doherty & Company deposed that he was a director of the Cities Service Securities Company; that all directors of the latter, except himself, were directors of the Cities Service Company, that Henry L. Doherty was president of both companies; that the treasurer of the Cities Service Company was vice president of the Cities Service Securities Company, that the first vice president of the one company held the similar position in the other, as did the secretary of each company. He further testified:

"My office is on the fifteenth floor of No. 60 Wall street, that is my office as head of the securities department of Henry L. Doherty & Company. *I guess my office as vice president of Cities Service Securities Company is the same place.* . . . The business of Cities Service Company and Henry L. Doherty & Company and Cities Service Securities Company is all carried on by what is known as the Cities Service organization. Cities Service Company owns all the stock of the Cities Service Securities Company except the director's share. . . . The salaries are of the members of the securities' department of Henry L. Doherty & Company. . . .

"I get my salary checks from Henry L. Doherty & Company.

. . . . . . . . . . . . . .

"I do not know how many employees Cities Service Securities Company has. . . . The Cities Service Securities Company have not any particular office, . . .

"Q. Then the employees of the Cities Service Securities Company, if there are any, would also be employees of some other branch of the organization? A. Possibly and possibly not. I could not say.

"Q. Do you know any that were not? A. I do not know any that are or are not. I am not familiar with the organization.

. . . . . . . . . . . . . .

"The Cities Service Securities Company is a close corporation—it is owned practically entirely by the Cities Service Company, and its stock is not for sale."

This court has no intention to intimate that a holding company cannot set on foot a corporate subsidiary to perform some under-

taking which would be impracticable or inexpedient for the parent company to do itself. (*State, ex rel., v. Hutchinson Gas Co.,* 125 Kan. 337, 339, 264 Pac. 44; *Wichita Gas Co. v. Public Service Comm.,* 126 Kan. 220, 229, 230, 268 Pac. 111.) But if the corporate business of the subsidiary and that of the parent company are so hazily confused that the officials themselves do not know which is which, the legal fiction of separate corporate entities evaporates, and courts will deal with the realities of the situation. (*Yates v. Sugar & Land Co. et al.,* 117 Kan. 405, 414, 231 Pac. 1034.)

Early in January, 1933, in the United States district court for Kansas, three federal judges participating, a series of ten cases brought by as many subsidiaries of the Cities Service Company, Nos. 1637-N to 1646-N, inclusive, against the Public Service Commission of the state of Kansas, was under consideration, and in the opinion of that court, it was said:

"We are of the opinion that the facts here justify the conclusion that the Cities Service Company (and some of its distributing subsidiaries) are engaged in a common enterprise, . . . that the Cities Service Company exercises such complete dominion and control over the Cities Service Gas Company and the distributing companies that, under the general rules of agency, the Cities Service Gas Company and the distributing companies are mere agencies or instrumentalities of the Cities Service Company, and that, in substance and effect, the Cities Service Company is, through such agencies, . . . engaged in a local business." (*Wichita Gas Co. v. Public Service Com.,* 2 F. Supp. 792.)

The evidence was amply sufficient to prove that the Cities Service Company was engaged in selling its securities in this state, and that, too, without the requisite permit required by the blue-sky law.

The other matters urged on our attention by the litigants have been diligently perused, but nothing appears requiring further discussion.

The judgments in both cases are affirmed.

THIELE, J., not participating.