**Commonwealth v. Rosenbloom Finance Corporation**

*Robert D. Myers*, for appellant.

*George W. Keitel*, Deputy Attorney General, for Commonwealth.

HERMAN, J., October 31, 1969.—In this case, Rosenbloom Finance Corporation, a Delaware corporation, hereinafter sometimes referred to as "Rosenbloom" or "defendant," has appealed from the decision of the Board of Finance and Revenue which had sustained the resettlement by the taxing departments of its franchise tax for the year ended December 31, 1963, fixing the tax at $25,972.03.

The appeal to this court was taken pursuant to section 1104 of The Fiscal Code of April 9, 1929, P. L.

343, as amended, 72 PS §1104, and was here heard by the court without a jury in accordance with the provisions of the Act of April 22, 1874, P. L. 109, 12 PS §688, et seq.

A stipulation of facts was agreed to and filed and we adopt these stipulations as our findings of fact, referring throughout this opinion to those facts necessary to an understanding of the case.

Two questions are raised by this appeal. First, was the valuation placed on the capital stock by the Commonwealth incorrect? Second, should the company have been taxed as a "holding company"? Both questions must be answered in the negative.

We shall first consider the valuation question. Defendant reported the value of its capital stock at $3,500,000 but the Commonwealth, on the settlement and resettlement by the taxing authorities, valued the capital stock at $5,500,000.

The Capital Stock Tax Act, Act of June 1, 1889, P. L. 420 §§20, 21, as amended 72 PS §§1871, 1902, levies a tax upon "the actual value" of the corporation's capital stock and provides in section 20, 72 PS §1902, that the capital stock shall be valued and appraised

"[A]t its actual value in cash as it existed at the close of the year for which report is made; taking into consideration, first, the average which said stock sold for during the year; and second, the price or value indicated or measured by net earnings or by the amount of profit made and either declared in dividends, expended in betterments, or carried into the surplus or sinking fund; and third, the actual value indicated or measured by consideration of the intrinsic value of its tangible property and assets, and of the value of its good will and franchises and privileges, as indicated by the material results of their exercise, taking also into consideration the amount of its indebtedness."

Defendant's assets on December 31, 1963, consisted principally of stock and securities listed on national security exchanges, and their value as shown by the exchanges on that date was $7,166,154. This was 98.04 percent of all of the company's assets. The remaining 1.96 percent of the assets, or $143,189 when added to the $7,166,154, brought the total value of the assets to $7,309,343. The company deducted from its valuation of assets $1,399,209 estimated capital gains tax which it would have incurred had it sold the securities on December 31, 1963, and, therefore, valued its equity at $5,890,355. The taxing officers, disallowing the estimated capital gains tax, valued the equity at $7,289,564.

None of defendant's stock was issued or sold during 1963. Defendant earned $186,823 during the tax year, however, and paid dividends that year of $150,000. Defendant's average five-year earnings were $141,934 and its average five-year dividends were $129,800.

Based on these figures, defendant reported the actual value of its capital stock as $3,500,000 and the Commonwealth as $5,500,000, as we have hereinabove noted.

Defendant argues that the lower figure is correct based on the fact that if it were to sell all of its securities, the capital gains tax would substantially reduce the money it would receive, and, additionally, that its holdings are so great that the theory of "blockage"[1] in the sale thereof should apply.

Defendant also relies on the earnings and divi-

---

[1] "Blockage" is the principle that where a large block of stock is to be valued, the actual sales at or around the valuation date do not fairly reflect the fair market value of the stock because they do not discount the depressing effect which the sale of a large number of shares would have on the market.

dends capitalized in the customary way[2] to show the actual cash value of its capital stock. Capitalization of earnings for 1963 would indicate a value of $1,868,230, and of dividends a value of $1,200,000. Similarly, the capitalization of the five-year average of earnings would indicate $1,419,340, and of dividends a value of $1,038,400.

The Commonwealth argues that where there are no sales of the stock of the taxpayer and all of its assets can be readily turned into cash at a market value established by the stock exchanges, that then dividends and earnings have little significance; the Commonwealth further argues that the hypothetical capital gains tax may not be deducted and the appropriateness of blockage was not shown and that the real value as shown by the exchange figure assumes the greatest importance.

It must be remembered that we are attempting to ascertain the "actual value in cash" of the capital stock, and while the statute admonishes us to "[take] into consideration" [3] the three elements (the selling price of the stock during the year, the net earnings or profit and dividends paid, and the actual value measured by the intrinsic value of its assets less its indebtedness), the statute nowhere indicates what weight should be put on any of the three elements. This is reasonable, for each company must be viewed in its particular circumstances.

In Commonwealth v. Pomeroy's, Inc., 344 Pa. 538, 541 (1942), it was stated:

"Valuation for capital stock tax purposes is not just a matter of figures and accounting; judgment as to value is required. We repeat what was said in Com. v. Penna. R.R. Co., 297 Pa. 308, 317, 147 A. 242, 'the

[2] Earnings are customarily capitalized at 10 percent, and dividends at eight percent.

[3] Italics ours throughout unless otherwise indicated.

value of capital stock is not a matter of strict formula but a matter of judgment. "Common sense and practical every-day business experience are the best guides for those entrusted with the administration of tax laws. Taxation is a practical and not a scientific problem." ' "

Following this decision, our court, in Commonwealth v. Beaver Valley Water Co., 56 Dauph. 143 (1944), in arriving at the proper valuation of capital stock, considered the sales price of all the company's assets in a sale that occurred four years after the tax year. The court reasoned that since the sale was far removed from the tax year, the sale price could not be the sole factor involved. In the instant case, the sale price, if the assets were to be sold, should carry great weight because the sale, if held, would be on the valuation date.

While earnings may in many cases be an important element in valuation, this is not true in all cases, and in Commonwealth v. Philadelphia Market St. Subway-Elevated Rwy. Co., 77 Dauph. 143 (1961), where the only element present was the intrinsic value of the tangible property, it was held that this alone was sufficient to reach a valuation without consideration of the other two elements. Our court there, speaking through Neely, P. J., said, page 147;

"It is true that in accordance with the statutory requirements, all elements of value must be considered when they are present, including intrinsic value, the dividends declared, market prices of stock, indebtedness; whatever may throw essential light on the subject. Here, however, we are dealing with a situation that has only one of the elements; that is, the intrinsic value of the assets, including good will, franchises and privileges. The other two statutory elements are absent because the defendant has placed beyond its control any ability to sell any of its stock or receive

anything but nominal income. . . ."

Although on appeal the judgment of the lower court was vacated, nevertheless, the Supreme Court, 408 Pa. 361, agreed with the Dauphin County court that it was proper in the circumstances there to consider only the intrinsic value of taxpayer's property, in the absence of the other two elements.

In both Commonwealth v. Progress Mfg. Co., Inc., 69 Dauph. 257, 263 (1956), and Commonwealth v. Keystone Shipping Co., 77 Dauph. 86, 99 (1961), this court found that dividends paid in those cases were not overly persuasive. And in Commonwealth v. First National Bank of Scranton, 63 Dauph. 298, 64 Dauph. 289 (1953), affirmed 378 Pa. 272 (1954), this court decided that the actual value of bank shares for tax purposes was dependent upon the actual value of the assets, and went on to say, 63 Dauph. 304;

"The test of actual value of an asset of a banking corporation as of a certain date is neither whether the asset will be retained a long or short period of time nor whether the appreciation representing the excess of selling price on the security market over cost will ever be realized; the test of actual value is what is a reasonable sum which will reflect the material worth of the asset. So long as the determination of actual value of an asset at a given date is based on facts and reasonable indicia of material worth, the action of the Department of Revenue will not be disturbed. . . ."

In the First National Bank of Scranton case, our court also held that it was proper to disallow a liability for Federal income tax to be paid the following year in arriving at the value of the shares of capital stock. It would seem then that if a *fixed* liability for tax could not be deducted from the value of the shares the *probable* capital gains tax, which, of course, was only a theoretical liability, should not here be de-

ducted in arriving at the intrinsic value of the assets of the company.

In a similar situation the Supreme Court in Commonwealth v. Butler County National Bank, 376 Pa. 66, 73-4 (1954), said:

"The shares tax is one imposed on actual value of shares on a certain date, and such value must reflect the actual value of assets on that date as determined from facts and based upon reasonable indicia of their material worth. The securities were not sold on or before December 31, 1945; therefore, no federal income tax was payable on the appreciation. The taxing officers need give no consideration to speculations concerning hypothetical contingencies."

While "blockage" may in a proper case be considered in arriving at the actual cash value of a company's capital stock, we cannot here consider it, because we have no basis in fact for finding that Rosenbloom's holdings in any company were of such size that a sale of them might depress the market. Blockage has been considered in arriving at a proper value for inheritance tax purposes and perhaps would be so considered for valuations in other taxes as well, but the taxpayer must prove by competent evidence that the effect of marketing a block of securities of the size being valued within a reasonable time of the valuation date would be to depress the market, and the extent of such depression. The taxpayer would have to show the size of the block of stock to be valued, the total amount of stock outstanding, and all other relevant matters. None of this was done here. See McNeil Tax Assessment Case, 213 Pa. Superior Ct. 356 (1968).

As we are required to do when an appeal is taken under section 1104 of The Fiscal Code, we have considered de novo all of the matters raised concerning the valuation, bearing in mind that we should attempt

to determine the "actual value in cash [of the capital stock] as it existed at the close of the year" by considering the three statutory elements: (1) the average sales price which the stock sold for during the year; (2) the price or value indicated or measured by net earnings or by the amount of profit made and either declared in dividends, expended in betterments, or carried into the surplus or sinking fund; and (3) the actual value indicated or measured by consideration of the *intrinsic value* of tangible property and assets and of the value of the goodwill and franchises and privileges as indicated by the material results of their exercise.

Here, the element of prime importance is the intrinsic value of the assets which, as shown by the stock exchanges, is over $7,000,000. Since these assets could have been readily turned into cash at approximately this figure on the valuation date, $7,000,000 comes close to being the *"actual value in cash."* But considering that the capitalized earnings received and dividends paid are less than $2,000,000, the fair value to be assigned to the capital stock should be less than $7,000,000. Fixing the value of the stock is not a matter of strict formula but a matter of judgment, and common sense and practical business experience are the best guides we can use. Taxation is a practical and not a scientific problem: Commonwealth v. Pennsylvania Railroad Co., 297 Pa. 308 (1929); Commonwealth v. Philadelphia Market Street Subway-Elevated Rwy. Co., supra; Commonwealth v. Pomeroy's, Inc., supra; Commonwealth v. Sykes Brothers, Inc., 48 D. & C. 436, 53 Dauph. 26 (1942); Commonwealth v. H. J. Heinz Co., 51 Dauph. 62 (1941); Commonwealth v. Westmoreland Coal Co., 37 Dauph. 166 (1933).

Upon all the evidence we conclude that the actual value in cash of the capital stock of Rosenbloom on

December 31, 1963, was $5,500,000, and we will not disturb that value so fixed by the taxing authorities.

We now turn our attention to the question of whether or not the company should be taxed as a "holding company."

The difficulty here arises because the legislative draftsman did not pay close attention to rules of grammar.

In the Act of August 24, 1963, P. L. 1228, 72 PS §1871(e), the legislature provided for special treatment of holding companies in the imposition of the capital stock tax and the franchise tax by adding the following to section 21 of the Capital Stock Tax Act of June 1, 1889, P. L. 420, 72 PS §1871, et seq., as amended:

"(e) Any holding company subject to the capital stock tax or the franchise tax imposed by this section may elect to compute said tax by applying the rate of tax of five mills . . . upon each dollar to ten per cent of the actual value of the whole capital stock. If exercised, this election shall be in lieu of any other apportionment or allocation to which such company would otherwise be entitled.

"The term 'holding company' shall mean any corporation (i) at least ninety per cent of the gross income of which for the taxable year is derived from dividends, interest, gains from the sale or other disposition of stock or securities and the rendition of management and administrative services to subsidiary corporations, and (ii) at least sixty per cent of the actual value of the total assets of which consists of stock, securities or indebtedness of subsidiary corporations.

"The term 'subsidiary corporation' shall mean any corporation, a majority of the total issued and outstanding shares of voting stock of which are owned by the taxpayer corporation directly or through one

or more intervening subsidiary corporations."

During the tax year of 1963, 99.31 percent of defendant's gross income was derived from dividends, interest and gains from the sale or other disposition of stock or securities, and 98.04 percent of its assets consisted of stock or securities; but none of the stock or securities held by defendant is issued by a corporation a majority of the total issued and outstanding shares of voting stock of which are owned by defendant directly or through one or more subsidiary corporations; and, of course, none of the income comes from dividends, interest or sales of stock or securities of subsidiary corporations.

Defendant contends that it comes within the "holding company" definition and should be taxed at only 10 percent of the actual value of its capital stock and not .935929 as the taxpayer initially reported and the taxing authorities resettled.

The Commonwealth contends that defendant cannot qualify as a holding company because none of the stock or securities held by it was issued by any "subsidiary corporation" as that term is defined in the statute.

Defendant counters with the argument that the term "holding company" in its traditional sense and as used in other than regulatory statutes means simply one corporation holding stock and securities of another corporation. And further, and on this defendant puts much reliance, a rule of grammar requires that qualifying words or phrases, unless a contrary intent appears, refer only to the last antecedent. From this rule of grammar defendant argues that the proper construction of subdivision (i) of section 21(e), supra, is that the words "subsidiary corporations" refer only to the last antecedent; viz., "the rendition of management and administrative services" and not to the words "dividends, interest, gains from the sale

or other disposition of stock or securities." Defendant also similarly argues that in subdivision (ii) of section 21(e) the words "subsidiary corporations" modify only the word "indebtedness" and not the words "stock, securities" which precede "indebtedness."

Defendant then would have us conclude that, since defendant does indeed hold stock and securities of other companies to the extent of more than 60 percent of its total assets and does indeed receive more than 90 percent of its gross income from dividends, interest and gains from sales of securities, it may elect to be taxed as a holding company.

This we cannot do.

Although as defendant points out, early definitions of "holding company" included all companies that owned stock in other companies without regard to the amount of such holdings or the element of control over such companies, we believe that by 1963 a holding company was generally conceded to mean a company that either owns or controls such a large interest in another or other corporations that it can dictate their policies through voting power or can control or influence their management, at least in part, by its ownership of their stock: 18 Am. Jur. 2d Corporations §12 (1965). Black's Law Dictionary (4th ed., 1957) defines "holding company" as "a super corporation which owns or at least controls such a dominant interest in one or more other corporations that it is enabled to dictate their policies through voting power; a corporation organized to hold the stock of other corporations; any company, incorporated or unincorporated, which is in a position to control or materially influence the management of one or more other companies by virtue, in part at least, of its ownership or [sic] securities in the other company or companies."

In Cities Service Co. v. Koeneke, 20 P. 2d 460, 87 A.L.R. 16, 29, the Kansas Supreme Court said:

"In Bonbright and Means' recent text-book, 'The Holding Company,' the authors have formulated the following as their definition: 'Any company, incorporated or unincorporated, which is in a position to control, or materially to influence, the management of one or more other companies by virtue, in part at least, of its ownership or [sic] securities in the other company or companies.' "

To the same effect see North American Company v. Securities & Exchange Commission. 327 U.S. 686 (1946) and Kelley, Glover & Vale, Inc. v. Heitman, 220 Ind. 625, 44 N.E. 2d 981 (1942).

In the matter of statutory construction and grammatical construction, it is our conclusion that here, too, defendant must fail in its contention.

It is hornbook law that the object of all construction and interpretation of statutes is "to ascertain and effectuate the intention of the Legislature," and further, that when the words of a statute are clear and free from all ambiguity, the letter of the law shall not be disregarded under the pretext of pursuing its spirit: Statutory Construction Act of May 28, 1937, P. L. 1019, sec. 51, 46 PS §551. We fail to find a real ambiguity here but, on the contrary, are of the opinion that the intention of the legislature is clear that holding companies as herein defined, that is, those whose holdings in other corporations are sufficiently large to allow some element of control of the management and policy of the subsidiary corporation, are the only companies for which an election might be made under the act in question.

In arriving at this conclusion, we are supported by the title of the act which specifically "[creates] an election for *holding companies*": Section 54, Statutory Construction Act, supra. We are also supported by the principle of statutory construction that words and phrases are to be construed according to their com-

mon and approved usage, and technical words and phrases that have acquired a peculiar or appropriate meaning are to be construed according to such peculiar and appropriate meaning: Section 53, Statutory Construction Act, supra.

The doctrine of "last antecedent" on which defendant principally relies is a rule of grammar that should only be applied where no contrary intention appears in the act. As we read the act here in question, an intention contrary to defendant's position clearly appears. Although the statutory language in section 21(e)(i) is not as grammatical as it might be, we conclude that the words "subsidiary corporations" refer not only to "the rendition of management and administrative services" but also to sources of the corporation's income. In section 21(e)(ii) the language is much clearer, and we here conclude that the ownership of the assets also refers to the subsidiary corporation and, of course, the legislature carefully defined "subsidiary corporation:" page 8, infra.

2 Sutherland Statutory Construction §4921 (3d ed., Horack) sums up the effect of the last antecedent rule, as follows:

"Referential and qualifying words and phrases, *where no contrary intention appears,* refer solely to the last antecedent. Thus a proviso is construed to apply to the provision or clause immediately preceding it. But where the sense of the entire act requires that the qualifying words apply to several preceding or even succeeding sections, the word or phrase will not be restricted to its immediate antecedent. *Thus it is apparent that the rule relating to relative or referential terms is of no great force and will be applied only when its application is consistent with the legislative intention."*

See also Morris v. Glen Alden Coal Company, 136 Pa. Superior Ct. 132, 137 (1939); 50 Am. Jur. Statutes

§269 (1944); 34 P. L. Encyc. Statutes §133 (1960).

And, finally, there is another rule of statutory construction to which we should refer for this, too, supports our conclusion on this question. This rule, section 553 of the Statutory Construction Act, provides that "grammatical errors shall not vitiate a law."

## CONCLUSIONS OF LAW

1. In appraising the value of the capital stock of defendant, Rosenbloom Finance Corporation, for franchise tax purposes for the year 1963, the Commonwealth properly valued such capital stock at $5,500,000.

2. Rosenbloom Finance Corporation is not a holding company under the Act of August 24, 1963, P. L. 1228, 72 PS §1871(e), and, therefore, may not exercise the election provided in that act for the computation of its franchise tax.

3. The Commonwealth properly resettled the 1963 franchise tax of defendant company at $25,972.03.

## ORDER

And now, this October 31, 1969, the appeal is dismissed, judgment is directed to be entered in favor of the Commonwealth and against Rosenbloom Finance Corporation in the amount of $25,972.03, unless exceptions be filed hereto within 30 days. The sum of $21,178.76 having been paid, the judgment shall be marked satisfied upon the payment of $4,793.27, plus costs and interest in the amount of $1,589.26 to October 24, 1969, and thereafter according to law.

The prothonotary is directed to notify all parties hereto or their counsel of this order forthwith.